**Mariusz KACZMARCZYK, et al., Petitioners,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Nos. 90–1964, 90–2070 and 90–2412.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 29, 1991.

Decided May 31, 1991.

Richard J. Puchalski (argued), Michael A. Grochowiak, Puchalski, Keenan & Reimer, Chicago, Ill., for petitioners.

Alison R. Drucker, Lori L. Scialabba (argued), David J. Kline, Dept. of Justice, Office of Immigration Litigation, Richard L. Thornburg, U.S. Atty. Gen., Washington, D.C., A.D. Moyer, Michael L. Harper, Samuel Der–Yeghiayan, I.N.S., Ira H. Raphaelson, Asst. U.S. Atty., Office of U.S. Atty., Chicago, Ill., for respondent.

Les S. Kuczynski, Polish American Congress, Gen. Counsel, Chicago, Ill., for amicus curiae, Polish American Congress.

John J. Pikarski, Jr., Zulkey, Pikarski & Gordon, Chicago, Ill., for amicus curiae Nat. Advocates Soc.

Before WOOD, Jr., FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

The petitioners in this consolidated appeal challenge the decision of the Board of Immigration Appeals to take notice of changed political circumstances and the resulting decrease in likelihood of persecution in their native country in the course of ruling on their applications for political asylum and withholding of deportation. We hold below that the Board may properly take official notice of such facts, but that asylum petitioners are entitled to an opportunity to respond. Established Board of Immigration Appeals procedures, we conclude, can be construed to allow petitioners adequate rebuttal opportunity.

## I.

The petitioners are Polish citizens who were ordered by the Immigration and Naturalization Service ("INS") to show cause why they were not deportable under § 241(a)(2) of the Immigration and Nationality Act ("Act"), 8 U.S.C. § 1251(a)(2). Each petitioner admitted deportability but sought political asylum and withholding of deportation under sections 208 and 243(h) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1158, 1253(h). All three received hearings before an Immigration Judge ("IJ"); in each case the petitioner's application for asylum and withholding of deportation was denied. All three appealed to the Board of Immigration Appeals ("BIA").

The BIA affirmed the IJ's determination in each case, noting that each petitioner had based his application on membership in or association with the Polish political organization Solidarity. In each case, the Board took administrative notice of the fact that because, beginning in September 1989, Solidarity joined with the Communist Party in a coalition government ruling Poland, its members were no longer being persecuted by Polish authorities for their organizational affiliation. Based on this fact and a review of the record in each case, the BIA concluded that none of the three petitioners proved that they had a "well-founded fear" of persecution upon return to Poland. 8 U.S.C. §§ 1101(a)(42)(A), 1158(a). Thus, the BIA affirmed the IJ's decision in each case and granted each petitioner a 30-day period of voluntary departure. The petitioners appeal the BIA's decisions.

### A. Mariusz Kaczmarczyk

Kaczmarczyk's asylum application and testimony indicated that he joined a pro-Solidarity student organization in 1980. From 1981 to 1983 he participated in anti-government protests in Krakow, Poland. Kaczmarczyk related that he was beaten by police during some of these demonstrations. He also testified that while he was never formally arrested or indicted by Polish authorities, he was on a number of occasions stopped by police and detained for several hours. Upon arrival in the United States in December 1984, Kaczmarczyk joined an American organization opposed to the communist government then ruling Poland.

Kaczmarczyk also testified that since arriving in the United States, he learned from a friend who was interrogated by the Polish police that Polish authorities have identified him as an anti-government activist. Finally, he testified that his parents, who remain in Poland, informed him that the Polish police had inquired about his whereabouts.

After a hearing, an IJ found that Kaczmarczyk had failed to prove either past persecution or a well-founded fear of future persecution, and consequently denied his asylum application. The IJ stated that Kaczmarczyk had not demonstrated that Polish authorities were aware of his activities or were inclined to punish him. Kaczmarczyk was granted a 90-day period of voluntary departure.

Kaczmarczyk appealed to the BIA, which on April 6, 1990 affirmed the IJ's decision. The BIA reasoned that in light of current political circumstances in Poland, Kaczmarczyk could not harbor a well-founded fear of persecution arising from his support of or membership in Solidarity. The BIA granted Kaczmarczyk a 30-day period of voluntary departure beginning April 6, 1990.

### B. Jozef Czajkowski

Czajkowski's asylum application and deportation hearing testimony demonstrated that he had been a member of the Polish army from 1968 to 1970 and that he has a wife and two children who remain in Poland. He testified that in 1980 he joined a Solidarity unit at his workplace. Czajkowski stated that as a member of his unit's leadership, he participated in Solidarity meetings and distributed the organization's literature.

Czajkowski testified that after martial law was declared in December 1981, he was arrested, detained, and forced to sign a pledge that he would cease Solidarity activities. He nevertheless continued to distrib-

ute Solidarity literature and was detained once again in 1982. Czajkowski was then sent to Iraq for two years to work on a road construction project. Upon his return to Poland in 1984, he resumed work at his state-owned former place of employment. Czajkowski continued to work there until he left for the United States in November 1985. He was fired from his position only after he failed to return after a year's leave of absence.

In 1987, Czajkowski's wife wrote him that since his departure, the police had searched their house on numerous occasions. She wrote that she was fined by the police for possessing Solidarity literature and that other Solidarity members also continued to be harassed by Polish authorities. Finally, Czajkowski testified that he continued his political activities in the United States as a member of an American organization opposed to the communist rule of Poland.

After conducting a hearing, an IJ concluded that Czajkowski had failed to show that he possessed a well-founded fear of persecution and denied his application for asylum. The IJ based this conclusion on the fact that Czajkowski had been permitted to leave Poland to work in Iraq for two years, had returned to his former job upon his return from Iraq, and was not dismissed from that job until he failed to return from the United States. The IJ granted Czajkowski a 90–day period of voluntary departure.

Czajkowski appealed to the BIA. On April 17, 1990 the BIA concluded that Czajkowski had failed to show past persecution or a basis for a well-founded fear of persecution and affirmed the IJ's ruling. In Czajkowski's case, too, the Board took notice of the fact that as a result of a change in government, Polish citizens, as a general matter, were no longer being persecuted by the Polish government for their involvement in Solidarity. The BIA granted Czaj-

kowski a 30–day period of voluntary departure to commence upon the issuance of its decision.

## C. Tadeusz Kusper

In his application for asylum and in testimony at his deportation hearing, Kusper indicated that he had been an early member of Solidarity. He explained that he had participated in meetings and strikes sponsored by the organization and in retaliation was denied benefits and raises at his place of employment. He testified that in 1982 he was arrested and held by the police for 24 hours; afterwards, the police harassed him with threatening telephone calls and visited his home. Kusper also testified that it took him more than two years to obtain a passport (he finally left Poland in October 1985) and that during that period he was frequently required to report to the police.

After a hearing, an IJ found that Kusper had not proven that he qualified as a refugee and was therefore ineligible for political asylum. The IJ based his conclusions on the vagueness of Kusper's testimony and his failure to substantiate either past persecution or a well-founded fear of future persecution. The IJ granted Kusper a 60–day period of voluntary departure. Kusper then appealed to the BIA, which on June 6, 1990, denied his appeal. In reaching its decision, the BIA noted that all of the events Kusper relied upon to substantiate his fear of persecution occurred before 1986, and that since then, political changes in Poland rendered his fear of future persecution unreasonable. The Board granted Kusper a 30–day period of voluntary departure to commence upon the issuance of its decision.

■ The petitioners appeal from the decisions of the BIA and seek both asylum and withholding of deportation.[1]

---

**1.** Petitioners acknowledge that their burden of proof to establish eligibility for political asylum is lower than that to avoid deportation under the withholding provisions of the INA. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 443–45, 107 S.Ct. 1207, 1219–20, 94 L.Ed.2d 434 (1987).

They concede that, should this court uphold the BIA's determination that they are ineligible for political asylum, we need not reach the issue of whether they qualify for withholding of deportation.

## II.

Petitioners raise several claims on appeal. First, they object to the BIA's taking official notice that the composition of the Polish Government had changed and that the likelihood that Solidarity supporters would be persecuted by the Polish government had thus decreased or disappeared. They contend that the Board's notice was inappropriate and unauthorized and that they were denied the opportunity to dispute the noticed facts in violation of their due process rights under the fifth amendment. The petitioners further argue that the Board improperly predicated its denials of their asylum applications solely on the changed political circumstances in Poland, and failed to consider other evidence they presented regarded their fear of future persecution in Poland. Finally, should we conclude that the preceding arguments have no merit, the petitioners request that we extend their period of voluntary departure by 60 days.

### A. Standard of Review

■ Political asylum procedures involve two steps. In the first step, an alien must demonstrate that she meets the statutory definition of refugee;[2] this is a factual determination. If the applicant succeeds in this regard, the Attorney General may, then, in his discretion, grant the applicant's asylum petition. See Carvajal–Muñoz v. INS, 743 F.2d 562, 567 (7th Cir.1984). We apply different standards of review to the BIA's factual findings and legal conclusions. We review the Board's factual findings under a substantial evidence standard. Id. at 1259. This requires that its conclusions be "substantially reasonable." Balazoski v. INS, 932 F.2d 638, 640 (7th Cir. 1991); Rodriguez–Rivera v. INS, 848 F.2d 998, 1001 (9th Cir.1988). Review of the

BIA's legal conclusions and interpretations of the INA, by contrast, is de novo. Zalega v. INS, 916 F.2d 1257, 1259 (7th Cir. 1990). Finally, the Attorney General's discretionary decision to deny political asylum to a statutorily eligible alien is reviewed under an arbitrary and capricious standard. Shahandeh–Pey v. INS, 831 F.2d 1384, 1387 (7th Cir.1987).

### B. Official Notice

■ The petitioners mount two attacks on the Board's decision to take official notice of political changes in Poland.[3] First, they contend that the notice taken by the Board was impermissibly broad; they argue that official notice of Solidarity's participation in the ruling coalition government in Poland and the resulting decline in government persecution of Solidarity supporters together "amounts to an across-the-board denial of all Polish asylum claims." Petitioner's Brief at 19. The petitioners argue that such use of official notice robs asylum adjudications of their individualized nature and in fact caused the Board in their cases to ignore evidence they presented regarding the possibility that they will be persecuted upon their return to Poland.

We believe that the Board's authority to take official notice—authority which the petitioners, as a general matter, do not dispute—is broad enough to encompass the notice taken in this case. In exercising official notice, administrative agencies may consider commonly acknowledged facts. See generally, 3 K. Davis, ADMINISTRATIVE LAW TREATISE § 15 (1980). The Board's notice of current events bearing on an applicant's well-founded fear of persecution— in this case Solidarity's participation in the Polish government—falls within this ac-

---

**2.** Under the INA, a "refugee" is a person who is unable or unwilling to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." See 8 U.S.C. § 1101(a)(42)(A).

**3.** In its review of each of the petitioners' applications, the Board stated:

The Board takes administrative notice that effective September 10, 1989, the Solidarity organization formally entered into the coalition government that is presently governing Poland. Given the fact that Solidarity is now part of the coalition governing Poland, there no longer exists any basis for the respondent's claim that he has a well-founded fear of persecution by the Polish government due to his association with Solidarity.

cepted category. *See McLeod v. INS,* 802 F.2d 89, 93 n. 4 (3rd Cir.1986); *Zamora v. INS,* 534 F.2d 1055, 1062 (2d Cir.1976) ("The attitude of the country of prospective deportation toward various types of former residents is a question of legislative fact" amenable to administrative notice) (Friendly, J.); 4 J. Stein, ADMINISTRATIVE LAW, § 25.01 (1986). Indeed, in a case much like the ones before us today, we recently recognized the BIA's authority to take notice of changed political circumstances. In *Kubon v. INS,* 913 F.2d 386, 388 (7th Cir. 1990), this court concluded that the BIA properly took official notice of Solidarity's participation in the coalition government then ruling Poland. We reiterate today that the BIA may take official notice of uncontroverted facts concerning political conditions in asylum seekers' home countries, including Solidarity's role in the Polish government.

Of course, the BIA took notice not only of the fact that political circumstances have changed in Poland, but that they have changed in such a way as to render unsupportable the petitioners' fears of future persecution. It is this inference that leads petitioners to protest that the notice taken by the Board will result in the uniform denial of all future Polish asylum claims. The fact that such a result might follow, however, is not sufficient reason to condemn the Board's actions in this case. Congress has mandated that only those aliens who have suffered past persecution or have a well-founded fear of future persecution may be granted asylum. To the extent that the BIA was correct in concluding that a Polish asylum applicant's fear of persecution should have evaporated—as an objective matter, at least—in the face of Poland's changed political circumstances, the applicant's quarrel is with Congress for directing that such an analysis take place, not the Board. The question that immediately presents itself, then, is whether the conclusion drawn by the BIA is a reasonable one, one that can be characterized as "commonly acknowledged."

We believe it was reasonable for the Board to conclude that Poland's changed political circumstances substantially diminished the likelihood that the Polish government would persecute Solidarity members and activists. This conclusion was supported by advisory opinions from the Department of State issued in response to each of the petitioners' applications, and we give considerable weight to that Department's opinion in matters concerning international affairs, its area of expertise. Moreover, the Board's judgment seems to comport with common sense. Governments are not likely to persecute their political supporters, particularly those like the petitioners who stood with them when to do so was to assume significant personal risk. In their brief before this court, the petitioners observed that the Communist Party continued to control the military and the police in the coalition governing Poland at the time the BIA took official notice of the changed political circumstances in Poland. The implication is that those with direct responsibility for maintaining public order in Poland were still likely to persecute Solidarity members. This argument, however, is without support in the record, and absent such support we decline to give it much weight. We further take judicial notice of the fact that the Communist Party is no longer a member of the government in power in Poland, and that Solidarity's long-time leader, Lech Walesa is now Poland's president.[4] Under these circumstances, we do not believe the BIA erred in considering the proposition that Solidarity members currently face a relatively insignificant risk of persecution in Poland to be "commonly acknowledged."

That is not to say that the Board may blindly apply this recognized fact to deny automatically every asylum application submitted by a Polish alien. The use of official notice does not substitute for an analysis of the facts of each applicant's individual circumstances. Uncontroverted

**4.** We exercise here our discretion to take judicial notice of further changes in Polish politics that occurred between the time of the BIA's decision and our review. *See Zalega,* 916 F.2d at 1266 n. 5; *Carvajal–Munoz,* 743 F.2d at 564 n. 2.

facts may be inapplicable to or of limited probative value in individual cases and the Board must remain open to this possibility. The petitioners are therefore right to demand that the BIA engage in a careful, individualized review of the evidence presented in their applications and hearings. The applicants' argument that the Board failed to so in their cases, however, is without merit. We note that agency action is entitled to a presumption of regularity, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and thus the burden is on the petitioners to convince us that the BIA gave short shrift to the evidence they presented. *See McLeod v. INS*, 802 F.2d 89, 95 n. 8 (3rd Cir.1986). Our review of the record and the Board's decisions suggests no reason to overturn this presumption; it appears that the Board did indeed give adequate consideration to the petitioners' evidentiary presentations and that its findings that the petitioners do not harbor well-founded fears of persecution are supported by substantial evidence.[5]

■ The petitioners' second and more challenging claim is that the Board violated their due process rights by not affording them an opportunity to rebut the facts of which it took official notice. This claim has both statutory and constitutional dimensions. As a statutory matter, the INA does not expressly entitle asylum petitioners to rebut noticed facts. The petitioners argue, however, that § 556(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 556(e), mandates that the BIA allow them such an opportunity. Section 556 provides that "[w]hen an agency decision rests on official notice ... a party is entitled, upon timely request, to an opportunity to show the contrary." This argument is misplaced, for the APA is not applicable to

deportation proceedings under the INA. Congress has directed that the procedures designated in the INA are the "sole and exclusive" procedures governing deportation hearings. 8 U.S.C. § 1252(b); *see also Marcello v. Bonds*, 349 U.S. 302, 310, 75 S.Ct. 757, 761, 99 L.Ed. 1107 (1955) ("[W]e cannot ignore ... the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings. Unless we are to require Congress to employ magical passwords in order to effectuate an exemption from the Administrative Procedure Act, we must hold that the present statute expressly supersedes the hearing provisions of that Act."). Because asylum proceedings initiated in the context of the deportation process are considered part and parcel of that process, *see Kashani v. Nelson*, 793 F.2d 818, 821 (7th Cir.), *cert. denied*, 479 U.S. 1006, 107 S.Ct. 644, 93 L.Ed.2d 701 (1986), *Carvajal–Munoz*, 743 F.2d at 567, the APA's procedural entitlements are not applicable to the proceedings before us.[6]

■ We turn, then, to the constitutional component of the petitioners' argument, which is that the BIA violated their fifth amendment due process rights by not allowing them an opportunity to rebut the noticed facts. It is well established that aliens are entitled as a constitutional matter to what has come to be known as a "meaningful opportunity to be heard," *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976), in deportation proceedings. This proposition can be traced back to the elder Justice Harlan's opinion in *The Japanese Immigrant Case*, 189 U.S. 86, 101, 23 S.Ct. 611, 614–15, 47 L.Ed. 721 (1903):

> [The executive may not] cause an alien who has entered the country, and has

---

**5.** In an *amicus curiae* brief filed in this appeal, the Polish American Congress and the National Advocates Society argue that the petitioners have proven statutory eligibility for asylum based on the past persecution to which they have each been subjected. The petitioners themselves do not raise this argument on appeal. We will reach issues raised solely by *amicus* filings in our discretion, *National Comm. on Egg Nutrition v. FTC*, 570 F.2d 157,

160 (7th Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978), and we decline to exercise that discretion in this case.

**6.** We note that the Third Circuit, without explicitly deciding, has assumed to the contrary. *See McLeod v. INS*, 802 F.2d at 94 (applying § 556(e) of the APA to asylum proceedings).

become subject in all respects to its jurisdiction, and a part of its population ... to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States.

*See also Johnson v. Eisentrager,* 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950); *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49–51, 70 S.Ct. 445, 453–55, 94 L.Ed. 616 (1950); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 597 n. 6, 73 S.Ct. 472, 478 n. 6, 97 L.Ed. 576 (1953); *Haitian Refugee Center v. Nelson,* 872 F.2d 1555, 1562–63 (11th Cir.1989), *aff'd in part sub nom., McNary v. Haitian Refugee Center,* —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); *Maldonado–Perez v. INS,* 865 F.2d 328, 332 (D.C.Cir.1989); *Ramirez v. INS,* 550 F.2d 560, 563 (9th Cir.1977) (quoting *Bilokumsky v. Tod,* 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923) (Brandeis, J.)).

The question, of course, is what constitutes a meaningful opportunity to be heard when the Board takes official notice of commonly acknowledged facts. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him *and the opportunity to meet it.*'" *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti–Fascist Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1950) (Frankfurter, J., concurring)) (emphasis added). An individual's opportunity to meet the case made against him is crucial: not only do such opportunities serve an important truth-seeking function, but they "generat[e] the feeling, so important to a popular government, that justice has been done." *McGrath,* 341 U.S.

at 172, 71 S.Ct. at 648. We believe the due process clause of the fifth amendment requires that petitioners be allowed an opportunity to rebut officially noticed facts, particularly when, as in this case, those facts are crucial to—indeed dispositive of—the outcome of the administrative proceeding. When courts allow agencies, as we do, "wide latitude in taking official notice ... it is essential that the parties be afforded an opportunity to present information 'which might bear upon the propriety of noticing the fact, or upon the truth of the matter to be noticed.'"[7] *Banks v. Schweiker,* 654 F.2d 637, 641 (9th Cir.1981) (quoting C. McCormick, LAW OF EVIDENCE § 333 at 771 (2d ed. 1972)). *See also Carson Products Co. v. Califano,* 594 F.2d 453, 459 (5th Cir.1979) ("It is a fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts."). Such fairness concerns appear to have motivated the drafters of Federal Rule of Evidence 201(e), which provides litigants in federal court with just such an opportunity to rebut judicially noticed facts. *See* Fed.R. Evid. 201, Notes of Advisory Committee on 1972 Proposed Rules ("Basic considerations of procedural fairness demand an opportunity to be heard on the propriety of taking notice"). We note, finally, that *not* to allow petitioners an opportunity to rebut noticed facts would sanction the creation of an unregulated back door through which unrebuttable, non-record evidence could be introduced against asylum petitioners outside of the statutorily-mandated hearing context, *see* 8 U.S.C. § 1252(b).

Having come to this conclusion, we need not, however, mandate that the BIA institute new procedures to accommodate our ruling, for its existing procedural

---

**7.** *Cf. Report of the Attorney General's Committee on Administrative Procedures in Government Agencies* 71–73 (1941) (cited in 4 J. Stein, ADMINISTRATIVE LAW, § 25.01 n. 7 (1986)):

[A] noticed fact ... may actually be wrong. Or, as is far more likely ... there may be room for reasonable disagreement concerning the significance of the facts which are noticed, and the deductions to be drawn from them....

The parties, then, are entitled to be apprised of the data upon which the agency is acting. They are entitled not only to refute but, what in this situation is usually more important, to supplement, explain, and give different perspective to the facts upon which the agency relies.

framework provides asylum petitioners with a mechanism to rebut officially noticed facts. Although it does not explicitly make reference to official notice, 8 C.F.R. § 3.2 provides that an asylum applicant may petition the Board to reopen her case to present new evidence between the time the BIA renders a decision and the time she is directed to depart the United States.[8] *See Chavarria v. U.S. Dept. of Justice*, 722 F.2d 666, 669 (11th Cir.1984). This mechanism provides asylum applicants with an opportunity to present the Board with evidence that the facts it officially noticed are incorrect or that they are true but irrelevant to their case. Presumably, where the motion to reopen presents evidence sufficient to call into question the Board's decision, the Board would then reopen the asylum proceeding to allow for a more extensive inquiry into the disputed facts.[9] Petitioners may appeal the Board's denial of such motions to this court. *See INS v. Abudu*, 485 U.S. 94, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988); *Dokic v. INS*, 899 F.2d 530, 532 (6th Cir.1990); *Roque–Carranza v. INS*, 778 F.2d 1373, 1374 (9th Cir.1985). Judicial review of motions to reopen, though governed by an admittedly deferential abuse of discretion standard, *see Abudu*, 485 U.S. at 107, 108 S.Ct. at 913, will ensure that Board decisions to take official notice in the face of petitioners' protests do not deprive them of their rights to fundamentally fair asylum proceedings. We therefore hold that the motion to reopen procedure allows asylum petitioners an opportunity to introduce evidence rebutting officially noticed facts which is sufficient to satisfy the requirements of the fifth amendment's due process clause.

The petitioners in the cases before us did not file motions to reopen, nor did they request from the BIA any other opportunity to respond to the noticed facts at issue. They do not argue that their failure to do so should be excused. Even if the petitioners had filed motions to reopen, the Board would have surely—and properly—denied them, as they have failed to identify any significant evidence which calls into question the correctness of the Board's notice. We therefore find the petitioners' challenges to the Board's decisions to be without merit, and affirm the Board's denial of their asylum applications.

### C. Voluntary Departure

Because we affirm the BIA's decision that the petitioners are ineligible for political asylum, we must address their request that this court reinstate each petitioner's period of voluntary departure for an additional 60 days. The petitioners contend that our review of BIA asylum decisions necessarily includes the power to extend a grant of voluntary departure so that the period begins on the date when this court's decision becomes effective. They contend that the refusal to suspend the running of the period of voluntary departure pending judicial review of Board decisions will deter asylum applicants from pursuing their statutory right to appellate review of BIA asylum determinations.

By statute, only the Attorney General and his designee possess the authority to grant voluntary departure. 8 U.S.C. §§ 1252(b), 1254(e). Voluntary departure affords deportable aliens significant advantages by permitting them to depart for any country willing to accept them and reenter the United States once they have obtained the proper documentation. *Contreras–Aragon v. INS*, 852 F.2d 1088, 1090 (9th Cir.

---

**8.** 8 CFR § 3.2 provides in part:

Reopening or reconsideration of any case in which a decision has been made by the Board [may be requested] by the party affected by the decision.... Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing....

**9.** We note that the filing of a motion to reopen does not serve to stay the execution of Board

rulings. *See* 8 CFR § 3.8(a). There thus exists the possibility that unsuccessful asylum applicants may be ordered to leave the country before the Board has ruled on their motions to reopen. We presume that when an asylum applicant uses a good faith motion to reopen to dispute officially noticed facts, the Board will exercise its discretion to stay the execution of its decision until it has had an opportunity to rule on the applicant's motion.

**598**

1988) *(en banc)*. By contrast, aliens who are deported face greater restrictions on their ability to reenter the United States as well as potential criminal penalties for failing to comply with those restrictions. 8 U.S.C. §§ 1182(a)(17), 1326.

 INS regulations allow an alien who has been granted voluntary departure to apply to the district director for an extension of the voluntary departure period. 8 C.F.R. § 244.2. Section 244.2 vests the district director with "sole jurisdiction" to reinstate or extend a grant of voluntary departure, except under certain circumstances not relevant here, and further provides that "no appeal may be taken" from the district director's determination. Thus, while this court has jurisdiction to review the BIA's denial of asylum applications, we lack authority to review the INS's discretionary grant of voluntary departure. *See Farzad v. INS*, 808 F.2d 1071, 1072 (5th Cir.1987); *Contreras–Aragon v. INS*, 852 F.2d at 1098 (Kozinski, J. dissenting). We are nevertheless concerned that the INS might use its power to grant or withhold voluntary departure to insulate the BIA's asylum decisions from judicial review. Deportable aliens should not be faced with the choice between enjoying the voluntary departure privilege and securing judicial review of Board determinations. *See, e.g., Contreras–Aragon*, 852 F.2d at 1090–1092; *Ballenilla–Gonzalez v. INS*, 546 F.2d 515, 521 (2nd Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 75 (1977). This concern has already led one court of appeals to rule that the INS may not decline to extend the voluntary departure period of an alien pursuing a non-frivolous appeal solely because he has brought such an appeal. *Umanzor–Alvarado v. INS*, 896 F.2d 14, 16 (1st Cir.1990). Should it come to our attention that the INS is wielding its discretion to withhold voluntary departure to deter applicants from seeking judicial review of BIA decisions, our scrutiny of that discretionary exercise might expand. The cases before us, however, do not present this possibility; the petitioners have not tendered evidence which suggests that the INS has exercised its voluntary departure power in such a troubling fashion. Indeed,

it appears that none of the petitioners even sought an extension of their term of voluntary departure pending this court's decision. Their apparent failure to file timely motions for extension can be remedied by filing a motion with the INS district director to *reinstate* voluntary departure. 8 C.F.R. § 244.2. If the petitioners pursue this procedural avenue, we encourage the INS to consider their requests with care.

### III.

For the foregoing reasons, the decisions of the Board of Immigration Appeals in the cases before us are

AFFIRMED.