16 F.3d 1225
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Agustin RHOA-ZAMORA, Petitioner,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 No. 92-3755.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 30, 1993.
Decided Dec. 23, 1993.
 
 1
 Petition for Review of an Order of the Board of Immigration Appeals, No. Aqe-ffo-uel.
 
 
 2
 B.I.A.
 
 
 3
 AFFIRMED.
 
 ORDER
 
 4
 This marks the second appearance before this court of Agustin Rhoa-Zamora ("Rhoa-Zamora"), a Nicaraguan national who was arrested and detained by United States Immigration authorities upon his illegal entry into this country on December 24, 1986. The Immigration and Naturalization Service ("INS") charged that Rhoa-Zamora was deportable under 8 U.S.C. Sec. 1251(a)(2). Petitioner conceded deportability but requested asylum, withholding of deportation, and voluntary departure pursuant to 8 U.S.C. Secs. 1158(a), 1253(h) and 1254(e). The Immigration Judge ("IJ") denied petitioner's requests for asylum and withholding of deportation but granted voluntary departure.
 
 
 5
 The Board of Immigration Appeals ("Board") dismissed Rhoa-Zamora's direct appeal, and this court denied his petition for review. Rhoa-Zamora v. INS, 971 F.2d 26 (7th Cir.1992), cert. denied, 113 S.Ct. 1943 (1993). The Board subsequently denied petitioner's motion to reopen[1] the proceedings pursuant to 8 C.F.R. Sec. 3.2, and this appeal followed. We affirm.
 
 BACKGROUND
 
 6
 At this hearing before the IJ on his application for asylum and withholding of deportation, Rhoa-Zamora testified that, as a devout Roman Catholic active in the Church's charismatic revival movement, he had been and would continue to be singled out for persecution by the Sandinistas. He testified that he had been identified by Sandinista authorities while attending religious gatherings, beaten by Sandinista mobs known as "the Turbas," and that he was subject to further reprisals for allowing his children to leave the country. Perhaps his most dramatic testimony, however, was that Sandinista supporters had on one occasion gathered outside his home to conduct a mock Mass, in the course of which they hung an effigy of his parish priest, Father Luis Amado Pena, a leader in the Catholic charismatic movement with whom petitioner claims to have been closely associated.
 
 
 7
 After weighing the evidence, the immigration judge denied Rhoa-Zamora's application for asylum or withholding of deportation. In his oral opinion, the IJ explained that an alien seeking withholding of deportation must establish by a "clear probability" that his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion. See INS v. Stevic, 467 U.S. 407, 413 (1984). To qualify for asylum, on the other hand, the alien must demonstrate that he or she meets the statutory definition of a "refugee," which requires him to show either past persecution or a "well-founded fear" of future persecution on account of one of the five grounds listed above. 8 U.S.C. Sec. 1101(a)(42)(A).
 
 
 8
 The immigration judge proceeded to find that Rhoa-Zamora's claims of past persecution and fear of future persecution were not "candid or credible." The IJ explained that petitioner was "evasive and did not answer the questions directly but circuitously and on occasions outright refused to answer the questions." The immigration judge also stated that he had observed the demeanor of the petitioner, "particularly [his] lack of eye contact with the court when answering the questions presented to him by the court." Noting that Rhoa-Zamora's original application for asylum had failed to make any mention of the Sandinistas having conducted a mock Mass outside his home, the IJ concluded that the petitioner had fabricated the story because it was the type of an event that "would not have been omitted from the original application" if it had actually taken place. Finally, the immigration judge observed that the petitioner did not ask his grown children to corroborate his accounts of past persecution although it would have been natural for them to do so if he had been truthful in his testimony.
 
 
 9
 The Board dismissed Rhoa-Zamora's appeal from the immigration judge's decision, explaining in a written order dated January 31, 1991, that:
 
 
 10
 [W]e take administrative notice that the Sandinista party no longer controls the Nicaraguan government. Effective April 25, 1990, a new coalition government, formed by parties in opposition to the Sandinistas ("UNO") has succeeded the former government of the Sandinista party following national elections and the inauguration of Violeta Chamorro as the new president. Further, the new president of Nicaragua has announced a general amnesty covering the hostilities between the former Contra resistance and the Nicaraguan government and an end to military conscription. Given that the Sandinista party no longer governs Nicaragua, under the present circumstances we do not find that the record now before us supports a finding that the respondent has a well founded fear of persecution by the Sandinista government were he to return to Nicaragua.
 
 
 11
 (Emphasis added).
 
 
 12
 On appeal to this court, we rejected Rhoa-Zamora's contention that the Board had violated his Fifth Amendment due process rights by taking administrative notice of the Nicaraguan election. Rhoa-Zamora v. INS, 971 F.2d 26 (7th Cir.1992) ("Rhoa Zamora I"). We agreed with the petitioner that "the Board apparently had based its decision solely on the change in government in Nicaragua without any examination of how that change related to Rhoa-Zamora's particular claims." Rhoa-Zamora I, 971 F.2d at 34. And we agreed that the Board's use of a "boilerplate" paragraph regarding the effect of the Nicaraguan election cast "a cloud over the Board's decision" and hindered "meaningful judicial review." Id. But we held that petitioner's due process right to a meaningful opportunity to rebut the Board's conclusion as to the significance of the Nicaraguan elections was not violated because "the mechanism of the motion to reopen, which allows asylum petitioners an opportunity to introduce evidence rebutting officially noticed facts" provided a sufficient opportunity to be heard. Id. (citations omitted). We admonished the Board, however, to consider petitioner's motion to reopen in "good faith."
 
 
 13
 Shortly thereafter, the Board issued a written decision denying Rhoa-Zamora's motion to reopen on the grounds that he had failed to present "evidence that he stands a reasonable likelihood of being singled out for persecution on account of his religious beliefs." The Board acknowledged that petitioner had submitted "voluminous documentary evidence" to support his contention that the Sandinista party continues to exert de facto control over the Nicaraguan government despite Chamorro's election. But the Board went on to hold that in deciding Rhoa-Zamora's motion to reopen it was not "appropriate" to determine the degree to which the Sandinistas exert control over the Nicaraguan government:
 
 
 14
 This issue is largely irrelevant to the present case since the overall conditions in Nicaragua are not the issue here. We would point out that the respondent primarily feared returning to Nicaragua because of his experiences as a Charismatic Catholic who was harassed, and who was beaten on one occasion, by Sandinista-led mobs. Our review of the present evidence introduced by the respondent does not show any indication that such mobs are still present in Nicaragua. In fact, the respondent's evidence indicates that between 80 and 90% of the population of Nicaragua is Catholic, as apparently has been the case for decades, including the years during the Sandinista-led government.
 
 
 15
 The Board also found that, according to the Department of State's Country Reports on Human Rights Practices for 1990, which Rhoa-Zamora himself had entered into evidence, Nicaragua's human rights record has dramatically improved since the 1990 elections "in spite of the fact that the Chamorro government entered into an agreement that effectively placed the military and police forces under the control of former high-ranking Sandinista officials." Finally, the Board reasoned that to the extent petitioner's fears were based on the general conditions in his native country, "such generalized fears will not afford an alien any of the protections set forth in the Immigration and Nationality Act."
 
 ISSUES
 
 16
 Rhoa-Zamora raises four issues for our review. He contends that the Board erred in declaring that the question of whether the Sandinistas continue to control the Nicaraguan government is irrelevant to the question of whether to grant his motion to reopen. He also argues that the Board erred in finding there was no evidence of continuing Sandinista mob activity and in relying on the fact that Nicaragua is "80-90% Catholic" to discredit his fear of religious persecution. Finally, he urges that recent news accounts demonstrate that the Board had an unrealistic "vision" of current Nicaraguan politics.
 
 DISCUSSION
 
 17
 Motions to Reopen immigration hearings are not authorized by statute, but by the Attorney General in regulations promulgated pursuant to the Immigration and Nationality Act. Accordingly, 8 C.F.R. Sec. 3.2 provides in relevant part that:
 
 
 18
 "Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing...."
 
 
 19
 (Emphasis added.)
 
 
 20
 Thus, as the Eighth Circuit recently observed:
 
 
 21
 "the granting of the motions is entirely discretionary with the board. Motions to reopen or reconsider in the immigration context are not appeals to the board from its own order, but are more accurately described as collateral attacks on the board's order.... These motions are more analogous to motions for relief from judgment for mistake or for newly discovered evidence made pursuant to Fed.R.Civ.P. 60(b)."
 
 
 22
 White v. INS, 62 LW 2250 (8th Cir. Oct. 8, 1993) (emphasis added).
 
 
 23
 We also have repeatedly stressed the "especially deferential" nature of judicial review of all final Board orders. Johnson v. INS, 962 F.2d 574, 577 (7th Cir.1992). We will not find an abuse of discretion "unless the denial of a motion to reopen is made without rational explanation, inexplicably departs from established policies or rests on an impermissible basis such as invidious discrimination against a particular race or group." Id. (citations omitted). It is against this standard of especially deferential review that we consider petitioner's claim that the Board erred in denying his motion to reopen.
 
 I.
 
 24
 Initially, Rhoa-Zamora argues that the Board abused its discretion in declaring his evidence of continuing Sandinista power "irrelevant." He contends that, having dismissed his original appeal by taking administrative notice of the "fact that the Sandinista party no longer controls the Nicaraguan government," the Board may not now deny his motion to reopen on the basis that it is irrelevant whether the Sandinistas in fact continue to control the government. Moreover, he urges that in declaring the issue of Sandinista control over the Chamorro government irrelevant, the Board also violated his Fifth Amendment due process right to a meaningful opportunity to rebut the Board's officially noticed facts.
 
 
 25
 The INS responds that the ultimate question before the Board has always been, not whether the Sandinistas retain substantial power, but "whether they still target, harass, threaten, and harm charismatic Catholics on account of their particular faith and practice" even after the Chamorro election. Thus, in the government's view, whether the Sandinistas retain de facto power is in fact largely irrelevant to the question of whether petitioner is entitled to asylum or withholding of deportation. Rhoa-Zamora's due process rights, the government contends, were also fully protected by the motion to reopen procedure that accorded him the opportunity to produce evidence that the Sandinistas are continuing to persecute charismatic Catholics.
 
 
 26
 It is well settled that Congress has not authorized the attorney general (or the immigration judge, as his or her agent) to withhold deportation unless the alien has shown a "clear probability of persecution" as demonstrated by "specific facts" establishing that "this particular applicant will more likely than not be singled out for persecution." Carvajal-Munoz v. INS, 743 F.2d 562, 573 (7th Cir.1984) (emphasis in original). Similarly, Congress has provided for discretionary grants of asylum only to those who qualify as refugees under 8 U.S.C. Sec. 1101(a)(42)(A) "because of persecution or a well-founded fear of persecution...." Id. And to demonstrate a well-founded fear of persecution, an asylum applicant must present "specific facts through objective evidence if possible, or through his or her own persuasive, credible, testimony, showing actual persecution or detailing some other good reason to fear persecution on one of the specified grounds." Id. at 576-77. Thus, the Board explained in its order, Rhoa-Zamora must provide some credible evidence of continuing Sandinista persecution of charismatic Catholics in order to persuade the Board to exercise its discretion to reopen his petition for asylum and withholding of deportation. Because none of petitioner's evidence that the Sandinistas still retain some power addresses the question of whether they are still persecuting Catholics, the Board viewed petitioner's evidence as irrelevant. We hold that this determination was well within the Board's discretion to make. As we have noted before, the Board, and not this court, is in the best position to identify the criteria upon which it will exercise its discretion to reopen the proceedings:
 
 
 27
 "The power to reopen a case and grant an adjustment of status is a power to dispense mercy. No one is entitled to mercy, and there are no standards by which judges may patrol its exercise. The amenability of a case to a merciful result depends on a relative claim. The petitioner for clemency argues that he is a good beneficiary relative to the many other people with competing claims. In order to tell whether [the petitioner] deserves merciful treatment, one must know not only the facts of her case but also the circumstances of the tens of thousands of other aliens seeking relief. If the Board is doing its job well, it is comparing the applicants against each other as well as evaluating them under moral and prudential standards. That comparison entails the assessment of thousands of aliens who are invisible to judges when a single alien seeks judicial review. The nature of the comparison makes it unsuited for judicial resolution."
 
 
 28
 Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir.1985).
 
 
 29
 We also agree with the Board that the motion to reopen procedure fully protected Rhoa-Zamora's constitutional right to due process. It is true that aliens have a due process right "to rebut officially noticed facts, particularly when ... those facts are crucial to--indeed dispositive of--the outcome of the administrative proceeding." Kacmarczyk v. INS, 933 F.2d 588, 596 (7th Cir.1991). Accordingly, we agree that the petitioner had a right to a meaningful opportunity to present the Board with evidence "sufficient to call into question the Board's decision." Kacmarczyk, 933 F.2d at 597. We are convinced, however, that there was no violation of this right in this case.
 
 
 30
 This circuit follows the majority rule that when an alien wishes to challenge the significance or accuracy of the Board's administratively noticed facts, the motion to reopen procedure "provides a sufficient opportunity to be heard to satisfy the requirements of due process." Rhoa-Zamora I, 971 F.2d at 34. Accord Chavez-Robles v. INS, 966 F.2d 1441 (4th Cir.1992); Gutierrez-Rogue v. INS, 954 F.2d 769, 773 (D.C.Cir.1992); Rivera-Cruz v. INS, 948 F.2d 962, 968-69. But see Gomez-Vigil v. INS, 990 F.2d 1111 (9th Cir.1993). And the record is clear that not only did the motion to reopen procedure provide Rhoa-Zamora with the opportunity to rebut the Board's administratively noticed facts regarding the 1990 Nicaragua elections, but that petitioner took full advantage of this procedure by filing, along with the long and detailed motion itself, a plethora of documentary evidence, all of which is now part of the record, and all of which has been reviewed once by the Board and once again by this court. Aliens have a due process right to rebut administratively noticed facts through a motion to reopen, Kacmarczyk, 933 F.2d at 597, but it cannot seriously be argued that an alien has a constitutional right to have such a motion granted absent any evidence that a reopening is necessary in order to avoid depriving the alien of his right "to fundamentally fair asylum proceedings." Id. We are convinced that the proceedings in this case were more than fundamentally fair. Indeed, the record confirms that the petitioner has now been afforded two--and arguably, three--separate opportunities to support his claim of a well-founded fear of religious persecution.[2] The "essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and the opportunity to meet it." Kacmarczyk, 933 F.2d at 596 (citations omitted). Here the record is clear that Rhoa-Zamora was provided with notice and an ample opportunity to meet the case against him, but that he simply failed to offer the type of "objective evidence" he needed in order to prevail before the Board.[3]
 
 II.
 
 31
 Petitioner claims that a reference in the Board's order to a lack of any evidence of continuing "Sandinista mob" activity demonstrates that the Board acted on the basis of a falsehood, which ultimately constitutes an abuse of discretion. Achacoso-Sanchez v. INS, 779 F.2d 1260, 1266 (7th Cir.1985). He points out that among the documents he submitted in support of his motion to reopen was the State Department's 1991 Country Reports, which refers to "Pro-Sandinista mobs" attacking and temporarily occupying radio stations, and the State Department's 1990 Report, which stated that "Progovernment groups were sometimes attacked by Sandinista turbas, as during a May 1 rally in Managua by independent unions."
 
 
 32
 But when the Board's statement regarding Sandinista mobs is read in context with the preceding sentence of its order, it becomes clear that the Board was not basing its decision on the absence of any roving mobs in the country, but on the fact that there was no evidence of Sandinista-led mobs attacking Catholic or other religious groups. The Board's statement reads:
 
 
 33
 "We would point out that the respondent primarily feared returning to Nicaragua because of his experiences as a Charismatic Catholic who was harassed, and who was beaten on one occasion, by Sandinista-led mobs. Our review of the present evidence introduced by the respondent does not show any indication that such mobs are still present in Nicaragua" (emphasis added).
 
 
 34
 Our review of the record confirms that although the petitioner's evidence contains examples of Sandinista mobs operating in labor, land, and media disputes, there is no evidence of any mob actions directed against Catholics. Thus the Board's statement that petitioner's evidence does not show that "such mobs" still exist was accurate and not reversible error.
 
 III.
 
 35
 The petitioner next contends that the Board committed reversible error in assuming that he would not face persecution upon returning to Nicaragua because "between 80-90% of the population of Nicaragua is catholic, as apparently has been the case for decades, including the years during the Sandinista-led government." The petitioner argues that he need not hold a minority religious faith or viewpoint in order to have a reasonable fear of religious persecution, and he cites the communists' brutal treatment of the Russian Orthodox Church in the former Soviet Union as an example of governmental persecution of a majority religion.
 
 
 36
 We certainly agree that one need not necessarily be a member of a minority religion in order to have a reasonable fear of religious persecution. But contrary to the petitioner's argument, the Board did not rule otherwise. Once again, the Board's statement has been taken out of context. When read in context, it is clear that the Board did not mean to imply that a Catholic's majority status necessarily insulated him or her from the threat of religious persecution. The Board's order immediately went on to note that the Board had reviewed numerous cases in which other Roman Catholics had met their burden of showing persecution at the hands of the Sandinistas:
 
 
 37
 "Our review of the present evidence introduced by the respondent does not show any indication that such [anti-Catholic, Sandinista-led] mobs are still present in Nicaragua. In fact, the respondent's evidence indicates that between 80-90% of the population of Nicaragua is Catholic, as apparently has been the case for decades, including the years during the Sandinista-led government. And while this Board has had numerous occasions to review cases from Nicaraguan nationals alleging religious persecution, the overwhelming majority of these cases involved harassment activities by Sandinista-led organizations, which saw the Catholic Church, a highly organized organization in its own right, as perhaps the major obstacle to consolidation over Nicaraguan society.
 
 
 38
 (Emphasis added.)
 
 
 39
 As the Board's order goes on to make clear, its basis for denying petitioner's motion to reopen was that "whatever the present situation in Nicaragua, the respondent has presented no evidence that he stands a reasonable likelihood of being singled out for persecution on account of his religious beliefs" (emphasis added).
 
 
 40
 The Board did not explain the significance of its "80-90% Catholic" statistic.[4] But it apparently was an accurate demographic statement (taken as it was from the State Department's Country Reports that the petitioner himself submitted to the Board), and there is no basis for holding that the Board abused its discretion in mentioning it.
 
 IV.
 
 41
 Finally, petitioner contends that events in Nicaragua since the Board's denial of his motion to reopen "confirm that the Board's denial of his asylum claim is no longer--and never was--grounded on a realistic vision of Nicaraguan politics." He asks us to take judicial notice of the news stories he included in a 128-page appendix in support of his brief "in deciding whether the Board may have acted too hastily in assuming that the Sandinistas were rendered impotent by the Nicaraguan presidential election."
 
 
 42
 Once again, we are of the opinion that the petitioner has mischaracterized the Board's order, which in no way depended on the naive assumption that the Sandinistas had been rendered "impotent" by the mere fact of the Nicaraguan presidential elections. On the contrary, the Board clearly stated that its decision was based on the fact that petitioner had once again failed to provide evidence that he had a well-founded fear of being singled out for persecution on account of his religious beliefs.
 
 
 43
 Although we admonished petitioner after his first appeal in this case that we "will not weigh evidence that the Board has not previously considered," Rhoa Zamora I, 971 F.2d at 34, we will observe that nowhere in the 128 pages of recent news stories contained in the appendix petitioner submitted in connection with this latest appeal is there any reference to even one post-election attack on, or threat to, any member of the Catholic charismatic movement. In this regard, a comparison of the U.S. State Department's pre- and post-election Country Reports on Human Rights Practices (which petitioner submitted to the Board in support of his motion to reopen) is instructive. The pre-election Country Reports for 1989 and earlier recounted in some detail the Sandinistas' virulent and sometimes violent anti-Catholic campaigns. The 1990 and 1991 Reports, by contrast, suggest that the 1990 presidential elections ushered in a return to religious toleration in Nicaragua. The 1991 Report states:
 
 
 44
 "The Constitution provides for freedom of religion. Although Nicaragua is at least 80 percent Roman Catholic, other religious groups practice without hindrance. Protestant denominations proselytize actively and now constitute as much as 20 percent of the population. Missionaries and church workers freely enter the country to engage in religious activities as well as development assistance. Radio Catolica, which was closed several times under the Sandinista regime, operated freely throughout 1990. The homilies of Cardinal Obando Bravo were featured regularly in La Prensa and on national television."
 
 
 45
 We by no means minimize the very real persecution suffered by many Nicaraguan Catholics at the hands of the Marxist-oriented Sandinistas during their reign. But that sad history of anti-Catholic bigotry is not at issue in this case. The sole issue has always been whether this asylum applicant, Rhoa-Zamora, could demonstrate a well-founded fear of being singled out for such persecution himself. Carvajal-Munoz, 743 F.2d at 574 (7th Cir.1984). The Board, after a careful, individualized review of petitioner's evidence, concluded that petitioner had produced no new evidence to suggest that he could make such a showing if the proceedings were reopened. Since without such evidence petitioner could not prevail on the merits of his claim that he continues to have a well-founded fear of being singled out for persecution on account of his religious beliefs, we hold that the Board did not abuse its discretion in declining to reopen the proceedings.
 
 
 46
 The decision of the Board of Immigration Appeals is
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 Although petitioner originally styled his motion as a "Motion for Reconsideration," he now accepts this court's characterization of it as a "Motion to Reopen." See Rhoa-Zamora v. INS, 971 F.2d 26, 29 (7th Cir.1992)
 
 
 [2]
 Petitioner was provided one opportunity at his original hearing on his application for asylum, a second opportunity in the course of his Motion to Reopen, and (as we will discuss later) has presented more than a hundred pages of additional documentation in support of his current appeal to this court
 
 
 [3]
 We have observed that a genuine due process problem might arise if the Board delayed a decision on an alien's already-filed Motion to Reopen until after he was deported ( see Rhoa-Zamora I, 971 F.2d 34 n. 8), but no such issue arose in this case
 
 
 [4]
 The government suggests in its brief that "perhaps" the Board meant the statistic to suggest that the cessation of Sandinista harassment of Catholics "may have been encouraged by the overwhelming Catholicism of the country's religious culture."