28 F.3d 1216
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Adrian CHAVEZ-ARISTAZABAL, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-4054.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 6, 1993.
Decided July 15, 1994.
 
 1
 Before KANNE and ROVNER, Circuit Judges, and CURTIN, District Judge*.
 
 ORDER
 
 2
 We are asked to review a final decision of the Board of Immigration Appeals ("BIA") denying Adrian Chavez-Aristazabal's application for a waiver of deportation under Sec. 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. Sec. 1182(c). For the reasons given below, we grant the petition for review and remand the case to the BIA for further proceedings.
 
 
 3
 At the outset, we note that this is an unusual case. The petitioner is a young man who has lived in the United States virtually all his life, having entered this country lawfully as a permanent resident when he was less than two months old. His native country of Columbia, to which the Immigration and Naturalization Service ("INS") wishes to deport him, is completely unknown to him. All of his close relatives live in the United States, either as citizens or permanent residents. He has a fiancee and two four-year-old children, all United States citizens. He is subject to deportation as a result of his conviction for a single act of delivering a controlled substance, cocaine, to an undercover police officer. Since his arrest and incarceration he has evidently made a sincere and conscientious effort at rehabilitation. His application for a Sec. 212 waiver of deportation, though supported strongly by both his family and his rehabilitation counselors, was denied by an immigration judge in what seems to us to be an unaccountably harsh decision. The BIA summarily affirmed, causing us to question whether it has given the petitioner's case the careful review and consideration to which he is entitled.
 
 I. Background
 
 4
 Adrian Chavez[1] is a 23-year-old native and citizen of Columbia. He was born on February 7, 1971, in Cali, Columbia, when his mother, who had been a permanent resident of the United States since 1967, was visiting on a family emergency. He entered this country lawfully as a permanent resident on March 26, 1971, when he was seven weeks old. He has lived here since that time, and has visited Columbia only once, when he was five. With the exception of his grandfather, who is now 87 years old, all of his close relatives live in the United States, either as citizens or permanent residents. Mr. Chavez is unmarried but is the father of twins, a boy and a girl, now aged four. Both of the children, and their mother, are United States citizens.
 
 
 5
 Mr. Chavez grew up on the South Side of Chicago. His father left home when he was six or seven years old, and he was raised by his mother. He left school when he was 16 or 17. He then worked at a succession of jobs, being employed fairly consistently until he was arrested in September 1990. At the time of his arrest he was living with his fiancee and children, at his mother's house.
 
 
 6
 Mr. Chavez has a history of substance abuse and street gang membership. He started drinking alcohol when he was 11 or 12 years old, and eventually became an alcoholic. At one time he smoked marijuana, and for a period of about two months was involved in selling that drug. In 1985, when he was 14, he became a member of a street gang which later became known as the Disciples. He remained in the gang until 1991, eventually becoming a "ranking member."
 
 
 7
 In 1989, Mr. Chavez began to supplement his income by selling cocaine, although he claims not to have used that drug himself. In all, he made a total of some 20-30 sales, obtaining the cocaine from his street gang friends. Most of the sales were of relatively small quantities--$25.00 bags, and a few "eight balls" for $175.00. On September 6, 1990, however, he made the mistake of agreeing to sell five kilograms of the drug to an undercover police officer. The price was set at $27,500.00 per kilogram. Upon delivery of a one-kilogram batch, Mr. Chavez was arrested. The police were unable to find the four additional kilograms that were allegedly part of the transaction.
 
 
 8
 On February 4, 1991, in the Circuit Court of Cook County in Chicago, Mr. Chavez pled guilty to the charge of delivering 900 grams or more of cocaine in violation of Chapter 56 1/2, Sec. 1401(A)(2)(D) of the Illinois Revised Statutes, and was sentenced to the statutory minimum term of 15 years in prison. He is now incarcerated at the Sheridan Correctional Center in Sheridan, Illinois.
 
 II. The Deportation Proceedings
 
 9
 On May 10, 1991, the INS filed an Order to Show Cause, alleging that because of his state court conviction for delivery of a controlled substance, an aggravated felony for immigration law purposes, see 8 U.S.C. Sec. 1101(a)(43), Mr. Chavez was subject to deportation under Secs. 241(a)(2)(B)(i) and 241(a)(2)(A)(iii) of the INA, 8 U.S.C. Secs. 1251(a)(2)(B)(i) and 1251(a)(2)(A)(iii). At his deportation hearings Mr. Chavez conceded deportability. However, during the course of the proceedings he applied for a waiver of deportation pursuant to Sec. 212(c) of the INA, 8 U.S.C. Sec. 1182(c).
 
 
 10
 An evidentiary hearing on the waiver application was held on February 25, 1992, and continued on March 27, 1992. Extensive testimony was taken from Mr. Chavez, his mother, his brother, and several other supporting witnesses. Numerous affidavits and letters of support were also entered into the record.
 
 
 11
 Much of the evidence presented at the waiver hearing related to Mr. Chavez' attempts at rehabilitation following his arrest and conviction. Mr. Chavez testified that during the period of his incarceration he had disassociated himself from his street gang, and was no longer a gang member. He had taken a welding course, obtained a G.E.D. high school equivalency degree, enrolled in college, and had become involved in Bible study. At Cook County Jail, where he had been held for several months following his arrest, he had joined "Future 16," a rehabilitation program for young street gang members. After his transfer to Sheridan Correctional Center he had entered the Gateway Foundation substance abuse program, a voluntary, full-time program in which participants are segregated from other prison inmates and given intensive substance abuse counseling. He became an active participant, and within a few months earned a position as a coordinator in the program.
 
 
 12
 Three witnesses associated with the prison system gave testimony strongly supporting Mr. Chavez' application. Sergeant Incarnacion Roldan, an experienced corrections officer at Cook County Jail, the founder and leader of the "Future 16" group and himself a former street gang member, testified that he had worked with Mr. Chavez for a period of seven to nine months, that he knew him well, and that he had no doubt that, given the opportunity, he would "get his life back on the right direction." Bobby Carbage, an Illinois state certified substance abuse counselor who was Mr. Chavez' counselor in the Gateway program and himself a Gateway graduate, testified that he had known Mr. Chavez since October 1991 and had daily contact with him, that he believed Mr. Chavez would not revert to alcohol and drug abuse, and that judging by Mr. Chavez' attitude and the progress he had made in the program, he stood "a real good chance of going back out into the world and being a productive member of his community." Finally, Jacqueline Wallace, a chaplain at Sheridan, testified that she had known Mr. Chavez since April 1991, that she believed he was very sincere in his efforts at rehabilitation and had "done a complete turnaround," and that he had the potential to make a positive contribution to the community upon his release from prison.
 
 
 13
 In opposing Mr. Chavez' waiver application, the INS called no witnesses. Instead, it relied on the record of his state court conviction, on Illinois State Police investigative reports concerning the circumstances of his arrest, on a summary of his disciplinary record following his incarceration which included a number of minor disciplinary infractions, and on cross-examination of his witnesses.
 
 
 14
 In an oral decision rendered on May 13, 1992, the Immigration Judge ("IJ") denied Mr. Chavez' waiver application, and ordered him deported to Columbia on the charge contained in the Order to Show Cause. In a per curiam order dated November 18, 1992, the BIA summarily affirmed, explicitly adopting the reasoning of the IJ. This appeal followed.
 
 III. Standard of Review
 
 15
 This court has jurisdiction to review all final orders of deportation, pursuant to 8 U.S.C. Sec. 1105(a)(a). Oviawe v. INS, 853 F.2d 1428, 1430 (7th Cir.1988). A deportation order is final only after the BIA issues its opinion, so we review the BIA's decision and not that of the IJ. Veraga-Molina v. INS, 956 F.2d 682, 684 (7th Cir.1992).
 
 
 16
 The grant or denial of a Sec. 212(c) waiver is within the discretion of the BIA.[2] This court reviews the BIA's decisions for abuse of discretion, and the review is "limited to whether the discretion was actually exercised and whether it was exercised in an arbitrary or capricious manner." Akinyemi v. INS, 969 F.2d 285, 288 (7th Cir.1992) (quoting Cordoba-Chaves v. INS, 946 F.2d 1244, 1246 (7th Cir.1991)). To the extent that it reviews the BIA's findings of fact, it does so under the substantial evidence standard. Cordoba-Chaves, 946 F.2d at 1249 (quoting Blackwood v. INS, 803 F.2d 1165, 1168 (11th Cir.1986) (" 'If the Board's decision is supported by substantial evidence, Congress has mandated that [a reviewing court] defer to the Board and affirm.' ")). See also, Martinez v. INS, 970 F.2d 973, 974 (1st Cir.1992).
 
 
 17
 In exercising its discretion under Sec. 212(c), the BIA must balance " 'the social and humane considerations in the alien's favor against any adverse factors that demonstrate his or her undesirability as a permanent resident in the United States.' " Henry v. INS, 8 F.3d 426, 432 (7th Cir.1993) (quoting Cortes-Castillo, 997 F.2d 1199, 1202 (7th Cir.1993)). See also, Cordoba-Chaves, 946 F.2d at 1247. The factors to be considered were identified by the BIA in Matter of Marin, 16 I & N Dec. 581 (BIA 1978). See Henry, 8 F.3d at 432; Cortes-Castillo, 997 F.2d at 1202. When the grounds for deportation are based on the alien's criminal activity, a heightened showing of favorable evidence is required to demonstrate unusual or outstanding equities to offset the grounds for deportation. Espinoza v. INS, 991 F.2d 1294, 1297 (7th Cir.1993) (citing Cordoba-Chaves, 946 F.2d at 1244).
 
 
 18
 In making a decision on a Sec. 212(c) waiver application, the BIA must " 'engage in a careful, individualized review of the evidence.' " Cortes-Castillo, 997 F.2d at 1203 (quoting Kaczmarczyk v. INS, 933 F.2d 588, 595 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991)). It must " 'consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.' " Cortes-Castillo, 997 F.2d at 1203 (quoting Veraga-Molina, 956 F.2d at 685); see also Henry, 8 F.3d at 432. It abuses its discretion if it fails to weigh important factors or neglects to state its reasons for denying relief. Id. (citing Veraga-Molina, 956 F.2d at 685).
 
 
 19
 When, on the basis of its review of the record, the BIA agrees entirely with the IJ's decision on a Sec. 212(c) application, it may summarily affirm. Arango-Aradondo v. INS, 13 F.3d 610, 613 (2d Cir.1994); see also Marquez-Medina v. INS, 765 F.2d 673, 675, n. 3 (7th Cir.1985). When it does so, a reviewing court will examine the IJ's decision to see whether it contains sufficient reasoning and evidence to enable the court to determine that the requisite factors were considered. Id. If, on the basis of this review, the court concludes that the BIA failed to conduct its own inquiry, that its review of the evidence was inadequate, or that it failed to consider important aspects of the applicant's claim, it will vacate the BIA's decision and remand the case for further proceedings. See Cortes-Castillo, 997 F.2d at 1203; Espinoza, 991 F.2d at 1301; Shahandeh-Pey v. INS, 831 F.2d 1384, 1389 (7th Cir.1987).
 
 IV. The Immigration Judge's Decision
 
 20
 In considering Mr. Chavez' Sec. 212 waiver application, the IJ applied the balancing test set forth in Marin, 16 I & N at 584-585. He found first that the principal adverse factor was Mr. Chavez' conviction of delivery of a controlled substance. He noted that:
 
 
 21
 [t]he circumstance of this particular transaction, of which the respondent stands convicted, suggests deep involvement in drug trade. A large amount, i.e., 5 kilograms, each with a sale price of approximately $27,500 was involved. The total price of the transaction was $137,500. The respondent personally delivered 1 kilogram and promised 4 more. He anticipated a profit of approximately $5,000. The sentence that he received after conviction was severe. Although a first offender, the court imposed a 15 year sentence on the respondent. By his own admission, the sale was no aberration. He started selling drugs when he was 13 years of age. He testified that he was carrying a weapon. He also acknowledged that he sold cocaine approximately twenty times. Moreover, during the time that the respondent was selling drugs, namely from 1985 to 1991, he was also a member of a street gang, Disciples street gang.
 
 
 22
 He found that the crime itself and the pattern of criminal behavior in which Mr. Chavez had engaged were "specific enough and significant enough to require a showing of 'unusual or outstanding equities.' "
 
 
 23
 The IJ then turned to the factors favorable to Mr. Chavez. He found Mr. Chavez' length of residence in the United States to be an "outstanding equity," and his family ties here and his paternity of two United States citizen children a "significant equity." He noted, however, that Mr. Chavez had "failed to legitimate [his] children by marrying the mother." He found that Mr. Chavez had made some positive first steps on the road to rehabilitation, observing that he had repudiated his gang membership and had been actively involved in the Gateway substance abuse program at Sheridan. He noted the supporting testimony of Sergeant Roldan, Bobby Carbage and Chaplain Wallace. But he continued:
 
 
 24
 it is noteworthy that the respondent's drug involvement here lasted over 6 years. He has a long history of drug abuse and sales of cocaine that culminated in a recent sale of a substantial amount of that drug. Much more money in cocaine was involved in that transaction than can be explained to be simply the result of his drug abuse or habit. Furthermore, the respondent was trying to make a large profit, $5,000, and was trusted by his suppliers enough to participate in a 5 kilo deal involving over $100,000 worth of cocaine. The respondent's changed attitude has arisen only during the period of his incarceration, a relatively brief period when contrasted with the duration of his drug abuse and sale.
 
 
 25
 He determined that it was premature to conclude that Mr. Chavez had been completely rehabilitated, and stated:
 
 
 26
 Because of the gravity of the offense of which the respondent stands convicted, the evidence of the respondent's changing direction must be clear. I don't believe it is in this case. Therefore, I don't find that rehabilitation is a significant equity here.
 
 
 27
 He concluded that Mr. Chavez' conviction and the circumstances surrounding his crime clearly outweighed his favorable equities, and so denied his request for a Sec. 212(c) waiver.
 
 
 28
 The BIA summarily affirmed, "for the reasons stated by the immigration judge." In considering Mr. Chavez' petition, therefore, we must review the IJ's opinion in order to determine whether the BIA's decision was founded on an adequate evaluation of the record and proper consideration of the requisite Marin factors.
 
 V. Analysis
 
 29
 As we have already noted, this case is an unusual one. Mr. Chavez has lived in the United States virtually all his life, and has an exceptionally strong interest in remaining here. The IJ's decision to deny his application for a Sec. 212(c) waiver seems unaccountably harsh, and the BIA's summary affirmance gives us pause. It is not our role to reweigh the evidence and substitute our own judgment for that of the BIA. Guillen-Garcia v. INS, 999 F.2d 199, 204 (7th Cir.1993). Nevertheless, in cases such as this, we must be particularly careful to insure that the BIA has fully considered the record and the issues raised by the applicant, and has "heard and thought and not merely reacted." Cortes-Castillo, 997 F.2d at 1203; Veraga-Molina, 956 F.2d at 685.
 
 
 30
 On appeal, Mr. Chavez argues that the IJ's, and so the BIA's, decision to deny him a Sec. 212(c) waiver was based, in part, on a mischaracterization of him as a "big-time cocaine salesman" instead of a "seriously messed up teenage gang member small-time drug dealer who was arrested on his first substantial sale of a kilogram of cocaine." He maintains that this mischaracterization was based on an erroneous determination that he had been involved in a five kilogram, rather than a one kilogram, deal. As a result of this error, he argues, the BIA could not have properly determined whether he had presented sufficient favorable Marin equities to overcome the negative factor of his drug conviction.
 
 
 31
 We believe there is merit in Mr. Chavez' assertion that the IJ mischaracterized the extent of his involvement in drug dealing. Our review of the record indicates that while the IJ may have had sufficient reason to conclude that the cocaine deal in which Mr. Chavez was involved was for five kilograms, not one, he may nevertheless have based his conclusions concerning Mr. Chavez' drug involvement in part upon factual determinations that are not supported by the record. Further, we think that he gave inadequate consideration to two, at least, of the Marin factors favorable to Mr. Chavez' case.
 
 
 32
 Mr. Chavez argues that the IJ's finding that he had been involved in a five kilogram, rather than a one kilogram, cocaine transaction was not based upon substantial evidence. His conviction was for the delivery of approximately one kilogram, and he maintains that although he told undercover police officers that he could deliver five kilograms, there is nothing in the record to show that he possessed, or could have obtained, that quantity. He maintains that the BIA's conclusion that he was "trusted by his suppliers to participate in a 5 kilo deal involving over $100,000 worth of cocaine" was not supported by the record, and greatly inflates the seriousness of the charges against him.
 
 
 33
 We agree that there is only slender support for the IJ's conclusion that the deal was for five kilograms, rather than one. There is no evidence that Mr. Chavez possessed or could have obtained more than one kilogram, and the police never found the additional four kilograms that were supposed to have been part of the transaction. The IJ's conclusion was based solely on Illinois State Police investigative reports. The reports indicate that Mr. Chavez had agreed at one point to supply three kilograms, and that at the urging of one of the officers, he agreed later to supply five. (R. 283). But they also make it clear that he told the officers that he was reluctant to deliver more than one kilogram at a time. (Id.). They are entirely consistent with Mr. Chavez' argument that the agents told him how much cocaine they wanted, and that although he never had access to more than one kilogram, he told them that he could supply everything they were asking for simply to "get them off his back."
 
 
 34
 We do not conclude that there was insufficient evidence to support the IJ's determination that the deal was for five kilograms. The consideration of information included in police reports concerning the circumstances surrounding an alien's arrest is appropriate in cases involving discretionary relief from deportation. Matter of Grijalva, 19 I & N Dec. 713, 722 (BIA 1985). Here, the police reports indicate that Mr. Chavez agreed to supply five kilograms, and in the usual case the IJ would be entitled to rely on this evidence.
 
 
 35
 Nevertheless, we are troubled by the IJ's failure to refer either to the evidence that it was the police officers who requested that Mr. Chavez supply five kilograms, (R. 164-165, 172, 283), or to Mr. Chavez' testimony that he could have obtained, or that he possessed, no more than one kilogram. (R. 164-165). While the IJ may have had reason to discount this evidence, his failure to discuss it gives us cause for concern.
 
 
 36
 We are troubled further by the IJ's conclusion that Mr. Chavez was "trusted by his suppliers enough to participate in a 5 kilo deal involving over $100,000 worth of cocaine." We think that this inflates the extent of Mr. Chavez' involvement in criminal activity. There is no evidence whatsoever to establish that he was trusted by his suppliers to participate in a five kilogram, or even a one kilogram, deal. This was by far the largest drug transaction in which Mr. Chavez had been involved. His waiver hearing testimony suggests that he was induced into participating by, and that he obtained the cocaine for the transaction from, a police informer,[3] and that the police agents made a series of demands that the size of the deal be increased. (R. 164-165, 172; see also, R. 283). The IJ's inference that there was a relationship of trust between Mr. Chavez and his suppliers, and particularly that he was trusted to participate in a kilogram-scale deal, is pure speculation. It suggests that the IJ concluded that Mr. Chavez was more deeply involved in cocaine trafficking than is supported by the record. In view of this, we think that further review of the IJ's factual findings concerning the adverse factors in Mr. Chavez' case is warranted.
 
 
 37
 In summarizing the adverse factors, the IJ found that Mr. Chavez had been selling drugs "from 1985 to 1991," a period of six years. Again, this finding is not supported by the record. Mr. Chavez testified that he sold marijuana for about 2 months when he was "about 15." (R. 162). He also testified that he sold cocaine "on and off" beginning in 1989. (R. 163-164). When he was first incarcerated following his arrest, he "passed on" marijuana to fellow members of his street gang who were in prison with him. (R. 144-145). However, there is nothing to establish that he sold any drugs after the date of his arrest on September 6, 1990. Mr. Chavez was involved in selling marijuana for two months in 1986, and cocaine for a period of up to about 20 months in 1989-90. The record does not support the conclusion that he sold drugs for a period of six years, "from 1985 to 1991."
 
 
 38
 In view of these two instances in which the IJ's factual findings are clearly not supported by the record, and of the IJ's failure to discuss the evidence that the cocaine deal for which Mr. Chavez was arrested and convicted was a one, rather than a five, kilogram transaction, we cannot have confidence that the BIA has engaged in the "careful, individualized review of the evidence" to which Mr. Chavez is entitled, and has "heard and thought" rather than "merely reacted." See Cortes-Castillo, 997 F.2d at 1203; Veraga-Molina, 956 F.2d at 685. Further, we think that there is merit in Mr. Chavez' contention that the IJ, and so the BIA, overstated the extent of his involvement in drug dealing, and so improperly inflated the adverse factors to be balanced against his favorable equities.[4]
 
 
 39
 Turning briefly to those favorable equities, we make two observations. First, in considering the question of hardship to Mr. Chavez and his family if Mr. Chavez were to be deported, as required under Marin, the IJ commented only that:
 
 
 40
 I would agree that the impact of deportation on this respondent is likely to be the separation from his family in the United States. However, nothing in my decision here requires either the respondent's children or fiancee to be separated from him. That would be their choice to make: whether to accompany him to Columbia or to remain in the United States.
 
 
 41
 The IJ received no evidence on the question of whether or not Mr. Chavez' fiancee and children could, in fact, choose to accompany him to Columbia.[5] His statement that nothing in his decision would require the separation of Mr. Chavez from his fiancee and children was pure speculation, and entirely improper. The possibility that his decision could indeed result in the forced separation of Mr. Chavez from his immediate family should not have been dismissed so lightly.[6]
 
 
 42
 Second, we find the IJ's analysis of the weight to be afforded to Mr. Chavez' attempts at rehabilitation confusing, and his conclusion that rehabilitation is "not a significant equity" in this case poorly justified. The IJ noted that Mr. Chavez had repudiated his gang membership, and had been actively involved in a drug treatment program,[7] making "a sincere and conscientious effort in that regard." He also noted the supporting testimony of Sergeant Roldan, Bobby Carbage and Chaplain Wallace. But he discounted Mr. Chavez' efforts at rehabilitation because of the gravity of his offense and the relatively brief period of his changed attitude compared to the duration of his involvement with drugs. What is entirely mysterious to us is why, given Mr. Chavez' troubled past, the IJ chose to discount the evidence of his, by all accounts, dramatic change in attitude and sincere attempt to renounce his former way of life, rather than to regard that evidence as an especially favorable equity. Of course, we cannot say that he, or the BIA, was required to conclude that rehabilitation was a significant equity in Mr. Chavez' case.[8] It is not our role to make such a determination. But at the very least, a more clearly reasoned explanation is necessary.
 
 VI. Conclusion
 
 43
 Our review of the IJ's decision in this unusual case indicates that a number of his findings were nothing more than speculation, unsupported by evidence on the record. As a result, we cannot have confidence that the IJ gave full consideration to all of the important factors in Mr. Chavez' case. We find his explanation for affording no significant weight to Mr. Chavez' efforts at rehabilitation inadequate. In view of the evident deficiencies in the IJ's decision, and the BIA's summary affirmance, we must conclude that the BIA failed to conduct its own careful review of the evidence, to adequately consider all of the issues raised, and to balance, in a fair manner, Mr. Chavez' favorable equities against the adverse factors weighing against him. This failure is an abuse of discretion. Accordingly, we vacate the order of deportation and remand the case to the BIA for further proceedings consistent with this order.
 
 
 
 *
 Judge John T. Curtin, Senior District Judge from the Western District of New York, is sitting by designation
 
 
 [1]
 In his brief, Mr. Chavez-Aristazabal refers to himself as Adrian Chavez. We will respect that preference and refer to him by that name also
 
 
 [2]
 Sec. 212(c) provides in pertinent part:
 Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General ...
 8 U.S.C. 1182(c). By its terms, this language refers only to aliens returning to the United States after a temporary absence. However, it has been interpreted to apply also to deportable aliens who have not left the country and who meet the 7-year unrelinquished domicile requirement. Variamparambil v. INS, 831 F.2d 1362, 1354, n. 1 (7th Cir.1987).
 
 
 [3]
 At the waiver hearing, the IJ questioned Mr. Chavez about the circumstances under which he became involved in the deal. (R. 171-172). Mr. Chavez testified that he had been contacted by one of his "so-called friends" in the Disciples, who had himself been contacted by undercover police officers. The IJ's examination continued:
 Q. Why do you think your friend would want this request to you [sic]?
 A. Today I know because he got busted so I guess he had to point somebody out or he had to get somebody in order for him to get less time or something like that.
 Q. You said that you had dealt in small amounts like an eight ball, few grams, can you explain why he would bring you a request for a kilogram?
 A. No, he was ... he came to me telling me, you know, I want to make this, I want to make that, and then I told him well go ahead and he goes why don't you make it and I said, I said I can't get that much. He goes no, he goes we'll get you that much. I said ... I needed the money, I said I'll go for it and I did.
 (R. 172).
 
 
 [4]
 In this regard, we also note that the IJ observed, in enumerating the adverse factors in Mr. Chavez' case, that the sentence he received after his conviction in state court was "severe," commenting that "[a]lthough a first offender, the court imposed a 15 year sentence on the respondent." This implies that the IJ believed that the court had the option to impose a shorter term, and that its decision not to do so was indicative of an adverse evaluation of Mr. Chavez. As Mr. Chavez' attorney pointed out at oral argument, however, the 15 year term imposed was the statutory minimum; the statutory maximum was 60 years
 
 
 [5]
 The IJ did hear related testimony from Mr. Chavez' mother, who stated that Mr. Chavez would not be able to take his children to Columbia because "the children's mother is American and she will not follow him out there." (R. 182)
 
 
 [6]
 We are troubled that while the IJ found Mr. Chavez' family ties to be a "significant equity," he apparently gave this equity reduced weight because Mr. Chavez' had "failed to legitimate [his] children by marrying the mother." (R. 73). The IJ's observation suggests that he believed that there was something irresponsible in Mr. Chavez' behavior in this regard. But Mr. Chavez explained that he did not marry his fiancee because of his arrest, and for economic reasons. This seems to be a perfectly sensible and responsible explanation
 
 
 [7]
 The record establishes that Mr. Chavez is, or at least was, an alcoholic. There is no indication that he has been treated, or needs treatment, for the use of any illegal drug
 
 
 [8]
 Nor can we quarrel with the IJ's determination that it was premature for him to conclude that Mr. Chavez had been completely rehabilitated