BARKETT, Circuit Judge,
dissenting:
I disagree with the majority’s penultimate conclusion that substantial evidence supports the Board of Immigration Appeals’ (“BIA”) determination that the two letters Akapo received threatening him with death were of “limited evidentiary value.” The BIA’s dismissal of the death threat letters as valueless cannot be supported by this record because it (1) completely ignores both letters’ content and (2) is irreconcilable with the Immigration Judge’s (“IJ”) determination that Akapo provided consistent, detailed, and corroborated testimony thereby making him a credible witness — a finding which has never been challenged in two appeals to both the BIA and this Court. When the death threat letters are afforded their appropriate evidentiary value, substantial, probative, and particularized evidence in this record compels a finding that Akapo’s former persecutors intend to kill him on account of his past activities should he return to Sierra Leone. Indeed, the BIA’s sole reliance on certain statements from the U.S. Department of State’s 2005 Country Report on Human Rights Practices for Sierra Leone (“2005 country report”) to the exclusion of the additional individualized and probative evidence submitted by Akapo lead it to erroneously conclude that the general changes in Sierra Leone are such that Akapo no longer has a well founded-fear of persecution in that country. Thus, I respectfully dissent from the majority’s ultimate affirmance of the BIA’s conclusion that there has been a fundamental change in Sierra Leone’s conditions such that Akapo’s presumed well-founded fear of persecution has been rebutted.
I.
Akapo applied for asylum and withholding of removal, alleging that he suffered past persecution and fears future persecution in Sierra Leone by members of the Revolutionary United Front (“RUF”)[1] on account of his political opinion and past activities opposing the RUF. Specifically, he testified that he became a leader in organizing peaceful protests against the RUF after it first asserted control over Sierra Leone. He was attacked following one of those marches by eight men wearing RUF armbands and carrying weapons, who accused him of organizing protest marches and then beat and kicked him and hit him with their guns. They also threatened to kill him. On another occasion, when Akapo accused the RUF soldiers of using school taxes for their benefit, two RUF soldiers beat him and other teachers. RUF members also passed by his house shouting that all non-supporters would be killed. Akapo and his sons also volunteered to help wounded ECOMOG[2] sol *906 diers when they were fighting the RUF rebels and told the ECOMOG troops where the RUF forces were hiding.
Although the legitimate government of Sierra Leone returned to power for a short time, RUF took control again after a bloody coup. Akapo and his family were threatened, and their house was shot at and burned down. He and his family safely escaped, fleeing to an area of town protected by ECOMOG forces. When Akapo returned to his house several weeks later, someone had written near his house “black justice,” which was a slogan used by the RUF to identify areas and people they targeted. Akapo and his family soon thereafter fled.
Akapo testified that even though the regime has changed, he still fears that he will be harmed should he return to Sierra Leone. He presented expert testimony in support of his claim, and submitted into evidence two letters he received after leaving the country, which threaten him with death upon his return to Sierra Leone.
The BIA concluded that Akapo was not eligible for asylum or withholding of removal because, even assuming that Akapo suffered past persecution, it concluded there has been a fundamental change in circumstances in Sierra Leone such that Akapo’s fear of future persecution is no longer well-founded. The only rebuttal evidence submitted by the government to Akapo’s claim of a well-founded fear of future persecution was the 2005 Country Report. Based solely thereupon, the BIA found “that in January 2002, the devastating 11-year civil conflict in Sierra Leone officially ended, and the Government, backed by a large United Nations peacekeeping force, subsequently asserted control over the entire country.” The BIA further found “that trials were in progress at year’s end for approximately 100 former combatants who fought for the RUF, including trials of RUF leaders.”[3] The BIA did acknowledge the two death threat letters received by Akapo but found them to be of “limited evidentiary value” because both were unsigned and one was not dated. Although the BIA failed to explain the import of this finding as it pertains to Akapo’s well-founded fear of future persecution, given the BIA’s ultimate denial of Akapo’s claim, it appears that the BIA determined that the letters were not genuine or at the least not relevant to Akapo’s claim that he has a well-founded fear of persecution in Sierra Leone. I believe the BIA erred.
II.
A. Authenticity of the Death Threat Letters
In concluding that the record does not compel a reversal of the BIA’s finding that the death threat letters are of “limited evidentiary value,” the majority asserts that it was reasonable for the BIA to question the authenticity of the death threat letters. The majority erroneously suggests that Akapo should have provided corroboration for the letters. This requirement, however, places an additional burden of proof on Akapo where the law does not, and in any event, is irreconcilable with the IJ’s undisputed credibility finding. *907 The relevant statutory and regulatory provisions governing asylum eligibility provide that an applicant’s credible testimony is sufficient to sustain his burden even without corroboration. See 8 U.S.C. § 1158(b)(1)(B); 8 C.F.R. § 208.13(a). An asylum applicant, however, can be called upon to provide corroboration to support the credibility of his testimony, see 8 U.S.C. § 1158(b)(l)(B)(ii). As in this case, where an applicant provides such corroborating documentation for his testimony and is found to be a credible witness, in part because of such corroborating evidence, the authenticity of such evidence can no longer be at issue. In such circumstances, the materiality of the evidence to a particular aspect of an applicant’s claim may still be at issue, but its genuineness is not.
Here, the IJ made an explicit finding that Akapo’s “consistent, detailed testimony and the corroborating documentation submitted,” made him a credible witness. The IJ specifically identified the two death threat letters and an affidavit from Aka-po’s son as part of the documentary evidence that was consistent with Akapo’s testimony and that informed the IJ’s finding that Akapo gave credible testimony. Neither the government nor the BIA has ever questioned the IJ’s favorable credibility finding, and thus, based on the record in this case, there is no basis to challenge the authenticity of the two death threat letters nor the affidavit from Akapo’s son. To do so, would call into question Akapo’s credibility, which we are without any authority to do given that the IJ’s explicit favorable credibility determination has never been disputed.
The majority (as did the BIA) also places undue significance on the fact that one of the death threat letters is not dated and both are not signed. The majority seems to consider this as evidence of the death threat letters’ lack of authenticity. This view of the evidentiary value of the letters, however, is unduly cramped and not supported by the evidence on this record as a whole.
The lack of a date or signature on a letter does not necessarily call into question the authenticity of such letter. It is hardly surprising that letters containing death threats are unsigned and lacking in the traditional formalities of written correspondence. The absence of a signature or date cannot serve as an adequate reason for failing to evaluate the content of a letter purporting to contain a threat. Without question the content of any letter must be evaluated to determine the legitimacy of the threats contained therein and the level of risk posed by such threats. It would certainly be a dereliction of duty for a police department, security agency or the secret service simply to disregard as implausible any threatening letters because they were unsigned.
Here, Akapo’s two letters, though unsigned, contain information through which the identity and intentions of their author(s) can be ascertained.[4] The letters, *908 through their plain words, indicate that they are being sent on behalf of a collective group of “family members” or “relations” who hold Akapo responsible for the deaths of their children because Akapo identified the children as RUF rebels to ECOMOG. Thus, the lack of a formal signature at the end of each letter does not call into question the identity of their authors. Indeed, the content of both letters compels a finding that they were written by the relatives of deceased RUF members, whom the relatives believe were killed because of Akapo’s support of ECO-MOG.
Second, although one of the death threat letters is not dated, other evidence in this record fills in that gap. Akapo submitted an affidavit from his son attesting that he received this letter in January 2005. While the son’s affidavit does not conclusively prove when the letter was written, it makes it reasonable to infer that by arranging for the delivery of the letter to Akapo’s son, the author intended that his message be taken seriously by Akapo at the time it was received in January 2005. Moreover, there is no basis on this record to challenge the veracity of the son’s affidavit as the IJ indicated that this affidavit, too, was supportive of its credibility finding.
B. Relevance of the Death Threat Letters
The majority also calls into question the relevance and probative value of the death threat letters to Akapo’s well-founded fear of future persecution by concluding that the BIA also reasonably discounted their evidentiary weight. To support its position, the majority cites to several statements in the 2005 Country Report (as did the BIA) that discuss the circumstances surrounding the end of the civil conflict in Sierra Leone beginning in 2002. According to the majority, therefore, “[s]ubstan-tial evidence supports the decision of the [BIA] that a fundamental change in country conditions rebutted Akapo’s fear that former rebels would target him if he returned to Sierra Leone.”[5]
Even though the statements in the 2005 Country Report demonstrate that conditions in Sierra Leone have improved generally, the government still has not presented evidence that rebuts Akapo’s individualized well-founded fear of future persecution as evidenced, in part, through the death threat letters. While it is necessary for the government to show changes in the circumstances of a particular country, those changes will not always be sufficient to meet the government’s *909 burden of rebuttal. See 8 C.F.R. § 208.13(b)(l)(i)(A) (requiring the government to show “[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant’s country of nationality”) (emphasis added); see also Ouda v. INS, 324 F.3d 445, 452 (6th Cir.2003) (“The INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant’s well-founded fear of persecution.”) (citations omitted). Where, as is true in this case, Akapo has presented credible testimony and other documentary evidence particularized to his circumstances and relevant to establish he has a well-founded fear of future persecution, evidence regarding general improvements in the country are insufficient alone to rebut the presumption.
Several circuits have explained that country conditions reports, which often describe conditions in a generalized manner, cannot always supplant consideration of specific evidence provided by an applicant in support of his or her well-founded fear. For example, the Third Circuit has noted the limitations on inferences that may be drawn from country conditions reports, stating the:
First, Seventh, Ninth, and Tenth Circuits agree that evidence of changed country conditions can successfully rebut an alien’s fear of future persecution based on past persecution only if that evidence addresses the specific basis for the alien’s fear of persecution; generalized improvements in country conditions will not suffice as rebuttals to credible testimony and other evidence establishing past persecution.
Berishaj v. Ashcroft, 378 F.3d 314, 327 (3d Cir.2004) (referencing Gailius v. INS, 147 F.3d 34, 36 (1st Cir.1998); Kaczmarczyk v. INS, 933 F.2d 588, 593-95 (7th Cir.1991); Rios v. Ashcroft, 287 F.3d 895, 901 (9th Cir.2002); and Krastev v. INS, 292 F.3d 1268, 1276-77 (10th Cir.2002)).
I agree that while the BIA can consider statements in a country conditions report to support its finding that conditions have changed, see Ruiz v. U.S. Att’y Gen., 440 F.3d 1247, 1259 (11th Cir.2006), it must also take into account other evidence that is consistent with an applicant’s claim that despite generalized improvements, his or her fear of future persecution remains “well-founded,” i.e. is subjectively and objectively reasonable, when deciding whether the fear has been rebutted. See, e.g. Krastev, 292 F.3d at 1276-77 (noting that the BIA’s conclusory reliance on the country conditions reports failed to reflect any consideration of an applicant’s individual circumstances); Chen v. I.N.S., 359 F.3d 121, 130 (2d Cir.2004) (holding that the BIA and IJ are “obligated to consider also any contrary or countervailing evidence with which [they are] presented, as well as the particular circumstances of the applicant’s case demonstrated by testimony and other evidence”).
Both death threat letters Akapo received are specific and probative evidence that Akapo’s former persecutors intend to kill him should he return to Sierra Leone notwithstanding the official end in 2002 to Sierra Leone’s devastating civil conflict and ongoing attempts to restore order to the country. The letters were written and delivered to Akapo well after the civil conflict ended in 2002. The statements in both letters show the resolve of the letters’ authors, i.e. RUF family members and/or sympathizers, to kill Akapo because of his support of ECOMOG should he ever return to Sierra Leone. Moreover it is apparent that the death threats expressed in the letters are not time-limited.[6]
*910 Additionally, that Akapo received these death threats prior to the time the State Department published the 2005 Country Report on Sierra Leone misunderstands the relevance of the letters; the letters are important not because they speak to what is happening generally in Sierra Leone but because they demonstrate the specific circumstances that are pertinent to Akapo should he return to Sierra Leone. The general improvements in Sierra Leone do not invalidate the individualized and particularized threats that are being conveyed in the two letters that Akapo has received. See e.g., Kaczmarczyk, 933 F.2d at 594-95 (explaining that the BIA cannot “blindly” apply the fact that there has been a change in the governing party of a country to deny automatically the asylum application of every person from that country). Likewise, the majority is wrong to dismiss the relevance of the death threat letters based on the fact that the 2005 Country Report does not contain any indication one way or the other as to whether “rebels target individuals like Akapo who had opposed [them] during the civil conflict.” The absence of an explicit statement in a country conditions report that mirrors the specific persecution feared by an asylum applicant is not conclusive evidence that such events have not occurred or could not occur to such an applicant.
Indeed, the 2005 Country Report contains information elsewhere that supports Akapo’s claim that he has a well-founded fear of returning to Sierra Leone even though the civil strife in Sierra Leone officially ended. It explains that although the government of Sierra Leone has asserted control over the country, the country is still experiencing widespread police and judicial corruption as well as official impunity. See 2005 Country Report available at http://www.state.gOv/g/drl/rls/hrrpt/ 2005/61591.htm (last visited April 14, 2010). As the majority acknowledges, the report also notes that there are still former RUF members in the country who continue to perpetuate abuses by holding persons, including women and children, as forced or common law spouses or as laborers. Id. Given the present government’s inability to insure the integrity of its own officials, the reports of ongoing RUF abuses, and the specific threats directed to Akapo, it is certainly reasonable for Akapo to be concerned about the government’s ability to control former members of RUF and to protect him and his family from them.[7] See Lin Lin Tang v. U.S. Att’y Gen., 578 F.3d 1270, 1280 (11th Cir.2009) (noting that widespread corruption as reported by the State Department in a country conditions report was relevant to and supported an asylum applicant’s claim of persecution).
Additionally, Akapo presented expert testimony from Dr. Earl Conteh-Morgan, a professor of international studies at the University of South Florida, who testified that Sierra Leone is not very stable at the current time because the “old elements of the RUF [are] just waiting for the right opportunity to strike back” and the government has not asserted control over “every aspect of the country.” He noted that many of the rank and file RUF members were given amnesty and are still living in Sierra Leone. Dr. Conteh-Morgan also opined that RUF members may go after *911 persons whom they thought were using ECOMOG forces and that an individual who had aided ECOMOG troops would be justified in being afraid to return to Sierra Leone. Finally, he opined that the RUF would target Akapo if he returned to Sierra Leone because Akapo had been very active in politics, had identified RUF rebels to ECOMOG soldiers, and would be unable to obtain adequate protection from the existing government.
Here, where the evidence relevant to Akapo’s individualized circumstances is considered, namely Akapo’s credible testimony, the two death threat letters, the affidavit of Akapo’s son, Dr. Conteh-Mor-gan’s expert opinion, and the 2005 Country Report’s statements about Sierra Leone’s ongoing widespread police and judicial corruption and official impunity, it cannot be said that the general improvements in Sierra Leone rebut Akapo’s presumed well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(l)(i)(A). Thus, I would reverse the BIA’s decision concluding that Akapo’s well-founded fear of future persecution has been rebutted.[8]
It is for the foregoing reasons that I dissent.

. The RUF is a violent and oppressive rebel group that previously infiltrated Sierra Leone’s national military and asserted control over parts of that country, including Freetown where Akapo and his family resided.

. According to the record, ECOMOG are the Nigerian peacekeeping forces that worked to prevent RUF from taking over Sierra Leone. ECOMOG eventually assisted in fighting the RUF rebels and dislodging them so that the elected government could return to Sierra Leone.

. In support of its conclusion, the BIA also noted that Akapo had fled Sierra Leone ten years ago, and that his family was still alive and unharmed in The Gambia. First, the fact that Akapo's family is living unharmed in The Gambia is irrelevant to whether Akapo has a well-founded fear of return to Sierra Leone. Second, while it is true that Akapo fled Sierra Leone ten years ago, he received one death threat five years after leaving the country and another death threat six years after leaving the country which both threaten Akapo with death should he return to Sierra Leone.

. Specifically, the letter dated June 13, 2004 and addressed to "Mr. Anthony" states as follows:
You will be amazed and surprised to receive this letter which should serve as a warning to you. We have not forgotten about the roll [sic] you played with ECO-MOG in Freetown. .
You caused our children to be killed by ECOMOG when you accused them of being rebel fighters. You too will die any time you return to Sierra Leone. There will be no hiding place for you then. Where ever you go you will die.
We the family members of the deceased are out to get your blood.
You have been warned.
The other letter that his son received in 2005 states as follows:
*908 This comes as a warning to you and your family, that we have not forgiven you. We are awaiting your return to Sierra Leone. We understand that you are still somewhere in the Gambia. You caused our children to be killed by ECOMOG. We cannot forget this fact; therefore any time you return to Sierra Leone you also will be killed. This is a warning from the relations of the deceased. That is all.

. I would note that whether "there has been a fundamental change in circumstances such that [an] applicant no longer has a well-founded fear of persecution in [his or her] country of nationality,” 8 C.F.R. § 208.13(b)(I)(i)(A), is a mixed question of law and fact. The particular changes in circumstances that have occurred in a country are factual findings that the IJ and BIA can make. We review those factual findings for substantial evidence, see Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir.2001), and must affirm them unless the record compels a contrary conclusion, see De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1006 (11th Cir.2008). However, the question of whether those changes in circumstances rebut an applicant's well-founded fear of future persecution is a legal one that we review de novo. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir.2007).

. The collective writers state that “[Akapo] too will die any time [he] return[s] to Sierra *910 Leone;” that they "are awaiting [Akapo's] return to Sierra Leone” and that "any time [he] return[s] to Sierra Leone [he] also will be killed.”

. It is well-recognized in this circuit that the harm which constitutes persecution can be perpetrated by non-governmental actors. See, e.g., De Santamaria, 525 F.3d at 999 (persecution by members of the Revolutionary Armed Forces of Colombia, a.k.a. "FARC”).

. In considering the entirety of the evidence in this record, I would actually conclude (rather than presume as the BIA did) that Akapo has established “with specific, persuasive and credible evidence that he ... is a refugee,” see 8 U.S.C. § 1158(b)(1)(A), (B); 8 C.F.R. § 208.13(a), because he has met his burden in establishing eligibility for asylum both on the basis of past persecution and well-founded fear of future persecution, see Mejia, 498 F.3d at 1256; see also 8 C.F.R. § 208.13(b).