[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11191

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 5, 2010
JOHN LEY
CLERK

Agency Nos. A094-000-463, A094-000-464

ANTHONY MICHAEL AKAPO,
EUGENIA CECILIA AKAPO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(May 5, 2010)

Before BARKETT, PRYOR and HILL, Circuit Judges.

PRYOR, Circuit Judge:

Anthony Michael Akapo, a native citizen of Sierra Leone, and his wife,

Eugenia Cecilia Akapo, petition this Court for review of the decision of the Board

of Immigration Appeals, which denied their applications for asylum and withholding of removal based on political and social group persecution. Eugenia Akapo has adopted her husband's arguments as the derivative beneficiary of his application. Akapo asserts that he suffered past persecution and has a well-founded fear of future persecution in Sierra Leone by members of the rebel group Revolutionary United Front on account of his political opinion. The Board found that Akapo was not entitled to asylum or withholding of removal because a fundamental change in country conditions in Sierra Leone rebutted the presumption of a well-founded fear of future persecution. Because that finding is supported by substantial evidence, we deny the petition.

## I. BACKGROUND

Akapo previously petitioned this Court to review the initial denial of his application for asylum and withholding of removal, and we remanded because the Board failed to render a reasoned decision. Akapo v. U.S. Att'y Gen., No. 08-10939 (11th Cir. Nov. 5, 2008). In its first decision, the Board had stated that "there [was] no indication in the record that former [Revolutionary United Front] rebels continue[d] to target those whom they believed were their enemies." We concluded that the Board overlooked evidence of two potential death threats against Akapo and misstated the record.

On remand, the Board again dismissed the appeal and denied Akapo's

2

petition for asylum and withholding of removal. The Board explained that, even assuming Akapo had suffered past persecution, country reports prepared by the Department of State proved that circumstances in Sierra Leone had fundamentally changed, which rebutted the presumption of a well-founded fear of future persecution. The Board found that the two death threats Akapo received after fleeing Sierra Leone had "limited evidentiary value" because one was undated and both were unsigned and from unknown sources. The Board also reasoned that Akapo left Sierra Leone ten years ago and that his children were living safely in The Gambia.

## II. STANDARD OF REVIEW

We review de novo the conclusions of law by the Board of Immigration Appeal, but we review findings of fact for substantial evidence to support them. Al Najjar v. Ashcroft, 257 F.3d 1262, 1283–84 (11th Cir. 2001). Our review for substantial evidence is highly deferential. Id. at 1284. We "must affirm the [decision of the Board] if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1284 (internal quotation marks omitted). "[W]e view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). We may not "re-weigh the evidence from scratch." Mazariegos v. U.S. Att'y Gen., 241 F.3d

1320, 1323 (11th Cir. 2001) (internal quotation marks omitted). "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi, 386 F.3d at 1027. To reverse factual findings by the Board, "we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). Although the Board must "consider all evidence introduced by the applicant," we do "not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1374 (11th Cir. 2006) (internal quotation marks omitted).

### III. DISCUSSION

An immigration judge and the Board of Immigration Appeals, acting on behalf of the Attorney General, have discretionary authority to grant asylum to those applicants who qualify as "refugees." 8 U.S.C. § 1158(b)(1). The applicant must prove that he meets the definition of a refugee. Id. §§ 1101(a)(42)(A), 1158(b)(1)(B)(i). After an applicant proves that he is a refugee, the applicant bears the burden of proving that he is entitled to asylum relief.

An applicant can establish eligibility for asylum relief by proving persecution in one of two ways: (1) proof that he was persecuted in the past on account of a protected ground; or (2) proof that he has a well-founded fear of future persecution on account of a protected ground. Silva v. U.S. Att'y Gen., 448

F.3d 1229, 1236 (11th Cir. 2006); see also 8 C.F.R. § 208.13(b). If the applicant proves past persecution, he is entitled to a presumption of a well-founded fear of future persecution, subject to rebuttal by the government. 8 C.F.R. § 208.13(b)(1). The government can rebut the presumption of a well-founded fear of future persecution by proving, by a preponderance of the evidence, either that there has been a fundamental change in circumstances in the applicant's country or that the applicant could avoid future persecution by reasonably relocating in another part of the country. Id. § 208.13(b)(1)(i). The Board assumed that Akapo had proved past persecution and was entitled to a presumption of a well-founded fear of future persecution, but the Board determined that the government had proved a change in country conditions in Sierra Leone to rebut Akapo's fear.

Akapo argues that the Board erred when it found that two death threats against him were of "limited evidentiary value," but the record does not compel us to reverse this finding. The Board reasoned that the letters were unsigned and received from unknown sources. The first letter is dated June 13, 2004, and the second letter is undated. The letters allege that Akapo caused the death of the author's children by identifying them as rebels to the opposition forces. It was reasonable for the Board to question the authenticity and discount the evidentiary weight of the two letters.

5

The only evidence Akapo presented to corroborate the death threats was an affidavit from his son, but that affidavit raises more questions than it answers. The affidavit states that Akapo's son received the second letter in January 2005 from Sierra Leone, but it does not provide any information about when the letter was written. Although the first letter is dated, on its face, in 2004 and Akapo's son received the second letter in January 2005, both of the letters predate the report of the Department of State upon which the Board relied on to find that circumstances in Sierra Leone had fundamentally changed; that report about conditions during the entire year of 2005 was published on March 8, 2006. See Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, 2005 Country Reports on Human Rights Practices: Sierra Leone (March 8, 2006), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61591.htm. There is no evidence in the administrative record that Akapo received any threat after the State Department reported that conditions in Sierra Leone had changed. The affidavit also does not provide any information to identify the author of the letters.

Substantial evidence supports the decision of the Board that a fundamental change in country conditions rebutted Akapo's fear that former rebels would target him if he returned to Sierra Leone. The Board found, and the record supports its finding, that the civil conflict in Sierra Leone ended in 2002, when the government that Akapo supported regained power. In 2002 the rebels and the government-

6

allied militia completed disarmament and international monitors declared the 2002 national elections and the 2004 local elections to be free and fair. By the end of 2004, United Nations peacekeepers withdrew from Sierra Leone. By the end of 2005, trials were in progress for about a hundred former rebel leaders and combatants. During 2005, no politically motivated killings by the government or its agents were reported. There were no reports of politically motivated disappearances in 2005. Although there is some evidence in the country reports that rebels may continue to commit some human rights abuses, such as continuing to hold women and children as forced common law spouses or laborers, the country reports do not evince that rebels target individuals like Akapo who had opposed the rebels during the civil conflict. See id. The record does not compel us to reverse the finding that circumstances in Sierra Leone had fundamentally changed to rebut Akapo's fear.

We do not reweigh the evidence, Mazariegos, 241 F.3d at 1323; instead, we consider whether the decision by the Board is supported by substantial evidence. Because Akapo failed to establish that he is entitled to asylum, he also failed to satisfy the more stringent standard for withholding of removal. See id. at 1324 n.2; see also Al Najjar, 257 F.3d at 1292–93.

We **DENY** the petition.

**PETITION DENIED.**

7

BARKETT, Circuit Judge, dissenting:

I disagree with the majority's penultimate conclusion that substantial evidence supports the Board of Immigration Appeals' ("BIA") determination that the two letters Akapo received threatening him with death were of "limited evidentiary value." The BIA's dismissal of the death threat letters as valueless cannot be supported by this record because it (1) completely ignores both letters' content and (2) is irreconcilable with the Immigration Judge's ("IJ") determination that Akapo provided consistent, detailed, and corroborated testimony thereby making him a credible witness — a finding which has never been challenged in two appeals to both the BIA and this Court. When the death threat letters are afforded their appropriate evidentiary value, substantial, probative, and particularized evidence in this record compels a finding that Akapo's former persecutors intend to kill him on account of his past activities should he return to Sierra Leone. Indeed, the BIA's sole reliance on certain statements from the U.S. Department of State's 2005 Country Report on Human Rights Practices for Sierra Leone ("2005 country report") to the exclusion of the additional individualized and probative evidence submitted by Akapo lead it to erroneously conclude that the general changes in Sierra Leone are such that Akapo no longer has a well founded-fear of persecution in that country. Thus, I respectfully dissent from the majority's ultimate affirmance of the BIA's conclusion that there has been a fundamental

8

change in Sierra Leone's conditions such that Akapo's presumed well-founded fear of persecution has been rebutted.

I.

Akapo applied for asylum and withholding of removal, alleging that he suffered past persecution and fears future persecution in Sierra Leone by members of the Revolutionary United Front ("RUF")[1] on account of his political opinion and past activities opposing the RUF. Specifically, he testified that he became a leader in organizing peaceful protests against the RUF after it first asserted control over Sierra Leone. He was attacked following one of those marches by eight men wearing RUF armbands and carrying weapons, who accused him of organizing protest marches and then beat and kicked him and hit him with their guns. They also threatened to kill him. On another occasion, when Akapo accused the RUF soldiers of using school taxes for their benefit, two RUF soldiers beat him and other teachers. RUF members also passed by his house shouting that all non-supporters would be killed. Akapo and his sons also volunteered to help

---

[1] The RUF is a violent and oppressive rebel group that previously infiltrated Sierra Leone's national military and asserted control over parts of that country, including Freetown where Akapo and his family resided.

wounded ECOMOG[2] soldiers when they were fighting the RUF rebels and told the ECOMOG troops where the RUF forces were hiding.

Although the legitimate government of Sierra Leone returned to power for a short time, RUF took control again after a bloody coup. Akapo and his family were threatened, and their house was shot at and burned down. He and his family safely escaped, fleeing to an area of town protected by ECOMOG forces. When Akapo returned to his house several weeks later, someone had written near his house "black justice," which was a slogan used by the RUF to identify areas and people they targeted. Akapo and his family soon thereafter fled.

Akapo testified that even though the regime has changed, he still fears that he will be harmed should he return to Sierra Leone. He presented expert testimony in support of his claim, and submitted into evidence two letters he received after leaving the country, which threaten him with death upon his return to Sierra Leone.

The BIA concluded that Akapo was not eligible for asylum or withholding of removal because, even assuming that Akapo suffered past persecution, it concluded there has been a fundamental change in circumstances in Sierra Leone such that Akapo's fear of future persecution is no longer well-founded. The only rebuttal evidence submitted by the government to Akapo's claim of a well-founded

---

[2] According to the record, ECOMOG are the Nigerian peacekeeping forces that worked to prevent RUF from taking over Sierra Leone. ECOMOG eventually assisted in fighting the RUF rebels and dislodging them so that the elected government could return to Sierra Leone.

fear of future persecution was the 2005 Country Report. Based solely thereupon, the BIA found "that in January 2002, the devastating 11-year civil conflict in Sierra Leone officially ended, and the Government, backed by a large United Nations peacekeeping force, subsequently asserted control over the entire country." The BIA further found "that trials were in progress at year's end for approximately 100 former combatants who fought for the RUF, including trials of RUF leaders."[3] The BIA did acknowledge the two death threat letters received by Akapo but found them to be of "limited evidentiary value" because both were unsigned and one was not dated. Although the BIA failed to explain the import of this finding as it pertains to Akapo's well-founded fear of future persecution, given the BIA's ultimate denial of Akapo's claim, it appears that the BIA determined that the letters were not genuine or at the least not relevant to Akapo's claim that he has a well-founded fear of persecution in Sierra Leone. I believe the BIA erred.

II.

A.      Authenticity of the Death Threat Letters

---

[3] In support of its conclusion, the BIA also noted that Akapo had fled Sierra Leone ten years ago, and that his family was still alive and unharmed in The Gambia. First, the fact that Akapo's family is living unharmed in The Gambia is irrelevant to whether Akapo has a well-founded fear of return to Sierra Leone. Second, while it is true that Akapo fled Sierra Leone ten years ago, he received one death threat five years after leaving the country and another death threat six years after leaving the country which both threaten Akapo with death should he return to Sierra Leone.

In concluding that the record does not compel a reversal of the BIA's finding that the death threat letters are of "limited evidentiary value," the majority asserts that it was reasonable for the BIA to question the authenticity of the death threat letters. The majority erroneously suggests that Akapo should have provided corroboration for the letters. This requirement, however, places an additional burden of proof on Akapo where the law does not, and in any event, is irreconcilable with the IJ's undisputed credibility finding. The relevant statutory and regulatory provisions governing asylum eligibility provide that an applicant's credible testimony is sufficient to sustain his burden even without corroboration. See 8 U.S.C. § 1158 (b)(1)(B); 8 C.F.R. § 208.13(a). An asylum applicant, however, can be called upon to provide corroboration to support the credibility of his testimony, see 8 U.S.C. § 1158(b)(1)(B)(ii). As in this case, where an applicant provides such corroborating documentation for his testimony and is found to be a credible witness, in part because of such corroborating evidence, the authenticity of such evidence can no longer be at issue. In such circumstances, the materiality of the evidence to a particular aspect of an applicant's claim may still be at issue, but its genuineness is not.

Here, the IJ made an explicit finding that Akapo's "consistent, detailed testimony and the corroborating documentation submitted," made him a credible witness. The IJ specifically identified the two death threat letters and an affidavit

12

from Akapo's son as part of the documentary evidence that was consistent with Akapo's testimony and that informed the IJ's finding that Akapo gave credible testimony. Neither the government nor the BIA has ever questioned the IJ's favorable credibility finding, and thus, based on the record in this case, there is no basis to challenge the authenticity of the two death threat letters nor the affidavit from Akapo's son. To do so, would call into question Akapo's credibility, which we are without any authority to do given that the IJ's explicit favorable credibility determination has never been disputed.

The majority (as did the BIA) also places undue significance on the fact that one of the death threat letters is not dated and both are not signed. The majority seems to consider this as evidence of the death threat letters' lack of authenticity. This view of the evidentiary value of the letters, however, is unduly cramped and not supported by the evidence on this record as a whole.

The lack of a date or signature on a letter does not necessarily call into question the authenticity of such letter. It is hardly surprising that letters containing death threats are unsigned and lacking in the traditional formalities of written correspondence. The absence of a signature or date cannot serve as an adequate reason for failing to evaluate the content of a letter purporting to contain a threat. Without question the content of any letter must be evaluated to determine the legitimacy of the threats contained therein and the level of risk posed by such

13

threats. It would certainly be a dereliction of duty for a police department, security agency or the secret service simply to disregard as implausible any threatening letters because they were unsigned.

Here, Akapo's two letters, though unsigned, contain information through which the identity and intentions of their author(s) can be ascertained.[4] The letters, through their plain words, indicate that they are being sent on behalf of a collective group of "family members" or "relations" who hold Akapo responsible for the deaths of their children because Akapo identified the children as RUF rebels to ECOMOG. Thus, the lack of a formal signature at the end of each letter does not call into question the identity of their authors. Indeed, the content of both letters

---

[4] Specifically, the letter dated June 13, 2004 and addressed to "Mr. Anthony" states as follows:

> You will be amazed and surprised to receive this letter which should serve as a warning to you. We have not forgotten about the roll [sic] you played with ECOMOG in Freetown.

> You caused our children to be killed by ECOMOG when you accused them of being rebel fighters. You too will die any time you return to Sierra Leone. There will be no hiding place for you then. Where ever you go you will die.

> We the family members of the deceased are out to get your blood.

> You have been warned.

The other letter that his son received in 2005 states as follows:

> This comes as a warning to you and your family, that we have not forgiven you. We are awaiting your return to Sierra Leone. We understand that you are still somewhere in the Gambia. You caused our children to be killed by ECOMOG. We cannot forget this fact; therefore any time you return to Sierra Leone you also will be killed. This is a warning from the relations of the deceased. That is all.

compels a finding that they were written by the relatives of deceased RUF members, whom the relatives believe were killed because of Akapo's support of ECOMOG.

Second, although one of the death threat letters is not dated, other evidence in this record fills in that gap. Akapo submitted an affidavit from his son attesting that he received this letter in January 2005. While the son's affidavit does not conclusively prove when the letter was written, it makes it reasonable to infer that by arranging for the delivery of the letter to Akapo's son, the author intended that his message be taken seriously by Akapo at the time it was received in January 2005. Moreover, there is no basis on this record to challenge the veracity of the son's affidavit as the IJ indicated that this affidavit, too, was supportive of its credibility finding.

## B.    Relevance of the Death Threat Letters

The majority also calls into question the relevance and probative value of the death threat letters to Akapo's well-founded fear of future persecution by concluding that the BIA also reasonably discounted their evidentiary weight. To support its position, the majority cites to several statements in the 2005 Country Report (as did the BIA) that discuss the circumstances surrounding the end of the civil conflict in Sierra Leone beginning in 2002. According to the majority, therefore, "[s]ubstantial evidence supports the decision of the [BIA] that a

15

fundamental change in country conditions rebutted Akapo's fear that former rebels would target him if he returned to Sierra Leone."[5]

Even though the statements in the 2005 Country Report demonstrate that conditions in Sierra Leone have improved generally, the government still has not presented evidence that rebuts Akapo's individualized well-founded fear of future persecution as evidenced, in part, through the death threat letters. While it is necessary for the government to show changes in the circumstances of a particular country, those changes will not always be sufficient to meet the government's burden of rebuttal. See 8 C.F.R. § 208.13(b)(1)(i)(A) (requiring the government to show "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality") (emphasis added); see also Ouda v. INS, 324 F.3d 445, 452 (6th Cir. 2003) ("The INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant's well-founded fear of persecution.") (citations

_____

[5] I would note that whether "there has been a fundamental change in circumstances such that [an] applicant no longer has a well-founded fear of persecution in [his or her] country of nationality," 8 C.F.R. § 208.13(b)(1)(i)(A), is a mixed question of law and fact. The particular changes in circumstances that have occurred in a country are factual findings that the IJ and BIA can make. We review those factual findings for substantial evidence, see Najjar v. Ashcroft, 257 F.3d 1262, 1283–84 (11th Cir. 2001), and must affirm them unless the record compels a contrary conclusion, see De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1006 (11th Cir. 2008). However, the question of whether those changes in circumstances rebut an applicant's well-founded fear of future persecution is a legal one that we review de novo. Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007).

16

omitted).  Where, as is true in this case, Akapo has presented credible testimony and other documentary evidence underlined particularized to his circumstances and relevant to establish he has a well-founded fear of future persecution, evidence regarding general improvements in the country are insufficient alone to rebut the presumption.

Several circuits have explained that country conditions reports, which often describe conditions in a generalized manner, cannot always supplant consideration of specific evidence provided by an applicant in support of his or her well-founded fear.  For example, the Third Circuit has noted the limitations on inferences that may be drawn from country conditions reports, stating the:

> First, Seventh, Ninth, and Tenth Circuits agree that evidence of changed country conditions can successfully rebut an alien's fear of future persecution based on past persecution only if that evidence addresses the specific basis for the alien's fear of persecution; generalized improvements in country conditions will not suffice as rebuttals to credible testimony and other evidence establishing past persecution.

Berishaj v. Ashcroft, 378 F.3d 314, 327 (3d. Cir. 2004) (referencing Gailius v. INS, 147 F.3d 34, 36 (1st Cir.1998); Kaczmarczyk v. INS, 933 F.2d 588, 593-95 (7th Cir.1991);  Rios v. Ashcroft, 287 F.3d 895, 901 (9th Cir.2002); and Krastev v. INS, 292 F.3d 1268, 1276-77 (10th Cir.2002)).

I agree that while the BIA can consider statements in a country conditions report to support its finding that conditions have changed, see Ruiz v. U.S. Att'y

17

Gen., 440 F.3d 1247, 1259 (11th Cir. 2006), it must also take into account other evidence that is consistent with an applicant's claim that despite generalized improvements, his or her fear of future persecution remains "well-founded," i.e. is subjectively and objectively reasonable, when deciding whether the fear has been rebutted.  See, e.g. Krastev, 292 F.3d at 1276-77 (noting that the BIA's conclusory reliance on the country conditions reports failed to reflect any consideration of an applicant's individual circumstances);  Chen v. I.N.S., 359 F.3d 121, 130 (2d. Cir. 2004) (holding that the BIA and IJ are "obligated to consider also any contrary or countervailing evidence with which [they are] presented, as well as the particular circumstances of the applicant's case demonstrated by testimony and other evidence").

Both death threat letters Akapo received are specific and probative evidence that Akapo's former persecutors intend to kill him should he return to Sierra Leone notwithstanding the official end in 2002 to Sierra Leone's devastating civil conflict and ongoing attempts to restore order to the country.  The letters were written and delivered to Akapo well after the civil conflict ended in 2002.  The statements in both letters show the resolve of the letters' authors, i.e. RUF family members and/or sympathizers, to kill Akapo because of his support of ECOMOG should he

18

ever return to Sierra Leone.  Moreover it is apparent that the death threats

expressed in the letters are not time-limited.[6]

Additionally, that Akapo received these death threats prior to the time the

State Department published the 2005 Country Report on Sierra Leone

misunderstands the relevance of the letters; the letters are important not because

they speak to what is happening generally in Sierra Leone but because they

demonstrate the specific circumstances that are pertinent to Akapo should he return

to Sierra Leone.  The general improvements in Sierra Leone do not invalidate the

individualized and particularized threats that are being conveyed in the two letters

that Akapo has received.  See e.g., Kaczmarczyk , 933 F.2d at 594-95 (explaining

that the BIA cannot "blindly" apply the fact that there has been a change in the

governing party of a country to deny automatically the asylum application of every

person from that country).  Likewise, the majority is wrong to dismiss the

relevance of the death threat letters based on the fact that the 2005 Country Report

does not contain any indication one way or the other as to whether "rebels target

individuals like Akapo who had opposed [them] during the civil conflict."  The

absence of an explicit statement in a country conditions report that mirrors the

---

[6] The collective writers state that "[Akapo] too will die any time [he] return[s] to Sierra Leone;" that they "are awaiting [Akapo's] return to Sierra Leone" and that "any time [he] return[s] to Sierra Leone [he] also will be killed."

specific persecution feared by an asylum applicant is not conclusive evidence that such events have not occurred or could not occur to such an applicant.

Indeed, the 2005 Country Report contains information elsewhere that supports Akapo's claim that he has a well-founded fear of returning to Sierra Leone even though the civil strife in Sierra Leone officially ended. It explains that although the government of Sierra Leone has asserted control over the country, the country is still experiencing widespread police and judicial corruption as well as official impunity. See 2005 Country Report available at http://www.state.gov/g/drl/rls/hrrpt/2005/61591.htm (last visited April 14, 2010). As the majority acknowledges, the report also notes that there are still former RUF members in the country who continue to perpetuate abuses by holding persons, including women and children, as forced or common law spouses or as laborers. Id. Given the present government's inability to insure the integrity of its own officials, the reports of ongoing RUF abuses, and the specific threats directed to Akapo, it is certainly reasonable for Akapo to be concerned about the government's ability to control former members of RUF and to protect him and his family from them.[7] See Lin Lin Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1280 (2009) (noting that widespread corruption as reported by the State Department in a

_____

[7] It is well-recognized in this circuit that the harm which constitutes persecution can be perpetrated by non-governmental actors. See, e.g., De Santamaria, 525 F.3d at 999 (persecution by members of the Revolutionary Armed Forces of Colombia, a.k.a. "FARC").

20

country conditions report was relevant to and supported an asylum applicant's claim of persecution).

Additionally, Akapo presented expert testimony from Dr. Earl Conteh-Morgan, a professor of international studies at the University of South Florida, who testified that Sierra Leone is not very stable at the current time because the "old elements of the RUF [are] just waiting for the right opportunity to strike back" and the government has not asserted control over "every aspect of the country." He noted that many of the rank and file RUF members were given amnesty and are still living in Sierra Leone. Dr. Conteh-Morgan also opined that RUF members may go after persons whom they thought were using ECOMOG forces and that an individual who had aided ECOMOG troops would be justified in being afraid to return to Sierra Leone. Finally, he opined that the RUF would target Akapo if he returned to Sierra Leone because Akapo had been very active in politics, had identified RUF rebels to ECOMOG soldiers, and would be unable to obtain adequate protection from the existing government.

Here, where the evidence relevant to Akapo's individualized circumstances is considered, namely Akapo's credible testimony, the two death threat letters, the affidavit of Akapo's son, Dr. Conteh-Morgan's expert opinion, and the 2005 Country Report's statements about Sierra Leone's ongoing widespread police and judicial corruption and official impunity, it cannot be said that the general

21

improvements in Sierra Leone rebut Akapo's presumed well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1)(i)(A). Thus, I would reverse the BIA's decision concluding that Akapo's well-founded fear of future persecution has been rebutted.[8]

It is for the foregoing reasons that I dissent.

---

[8] In considering the entirety of the evidence in this record, I would actually conclude (rather than presume as the BIA did) that Akapo has established "with specific, persuasive and credible evidence that he . . . is a refugee," see 8 U.S.C. § 1158(b)(1)(A), (B); 8 C.F.R. § 208.13(a), because he has met his burden in establishing eligibility for asylum both on the basis of past persecution and well-founded fear of future persecution, see Mejia, 498 F.3d at 1256; see also 8 C.F.R. § 208.13(b).